**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHAEL EMERSON CORRELL, *Petitioner-Appellant,* v. CHARLES L. RYAN, Warden, Acting Director, Arizona Department of Corrections; DORA B. SCHRIRO, Director, *Respondent-Appellee.* | No. 03-99006 D.C. No. CV-87-01471-PHX-SMM ORDER AND AMENDED OPINION AND AMENDED DISSENT |

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, District Judge, Presiding

Argued and Submitted
September 26, 2005—San Francisco, California

Filed May 14, 2008

Before: Mary M. Schroeder, Diarmuid F. O'Scannlain and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thomas
Dissent by Judge O'Scannlain

**COUNSEL**

Thomas Phalen and Jon M. Sands, Phoenix, Arizona, for the appellant.

James P. Beene, Kent E. Cattani, and Terry Goddard, Phoenix, Arizona, for the appellee.

**ORDER**

In response to the petition for rehearing, the panel has elected to file an amended opinion and amended dissent. The amended opinion and dissent are filed concomitantly here-

with. With the filing of the amended opinion and dissent, Judges Schroeder and Thomas voted to deny the petition for rehearing and rehearing en banc. Judge O'Scannlain voted to grant the petition for rehearing and rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for rehearing and rehearing en banc is DENIED. The Court will entertain a further petition for rehearing and rehearing en banc as to the amendments made to the opinion. *See* Ninth Circuit General Order 5.3(a).

All pending motions are DENIED.

Judge Callahan's dissent from rehearing en banc follows:

---

CALLAHAN, Circuit Judge, with whom KOZINSKI, Chief Judge, and O'SCANNLAIN, KLEINFELD, TALLMAN, and BEA, Circuit Judges, join, in dissenting from the denial of rehearing en banc:

I respectfully dissent from our denial of rehearing en banc because the panel majority fails to give deference to the district court's factual findings as required by *Hovey v. Ayers*, 458 F.3d 892, 900 (9th Cir. 2006), and improperly interprets the test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), so as to create an almost irrebutable presumption of prejudice.

Over twenty years ago, Michael Correll was convicted of three counts of first-degree murder, with four aggravating circumstances, and sentenced to death. *State v. Correll*, 148

Ariz. 468, 471, 478-81 (1986). The Arizona Supreme Court affirmed the convictions, three of the aggravating circumstances, and the sentence. *Id*. at 485. In his federal habeas petition Correll contends that he was denied the effective assistance of counsel at trial as guaranteed by the Sixth Amendment. On remand from this court, the district court conducted a nine-day evidentiary hearing. The district court concluded that although the performance of Correll's attorney at sentencing was deficient, Correll was not prejudiced.

The panel majority's opinion reweighs the evidence before the district court and reverses its conclusion by ignoring the district court's factual findings as well as the second prong of the *Strickland* test for ineffective assistance of counsel. The majority opinion collapses the two *Strickland* prongs into one prong. The opinion implies that if counsel makes a strategic decision not to investigate or present what it calls "classic mitigating circumstances" that would nonetheless open the door to more damaging aggravating evidence, prejudice will be presumed. It compounds this mistake by failing to appreciate that in this case even if a presumption of prejudice arises, the presumption was, as the district court found, rebutted. Moreover, if the facts in this case do not rebut the majority's presumption of prejudice, the presumption in effect becomes irrebutable. For these reasons, I dissent from our decision not to rehear this matter en banc.

# I

Although it is not clear from the panel majority opinion, the district court in its 109-page opinion found that trial counsel's performance had been deficient on only two matters. First, the district court held:

> Notwithstanding *Strickland's* recognition that defense counsel's duty to investigate, develop and present mitigating evidence can be reasonably based on a judge's sentencing tendencies, the Court reluc-

tantly and narrowly concludes that [counsel's] per-
formance was deficient because he failed to review
Petitioner's mental health records . . . before making
sentencing strategy decisions.

Second, the district court again narrowly concluded that given
the overwhelming aggravating circumstances that Correll
faced, counsel "should have obtained the medical treatment
records" concerning Correll's head injury when a wall fell on
him when he was seven years old.

The district court, however, rejected a number of other
challenges to the attorney's performance. For example, the
district court noted:

> The Court specifically finds that [counsel] did main-
> tain regular contact with Petitioner prior to sentenc-
> ing and rejects Petitioner's allegation that [counsel]
> only spent five minutes with him between conviction
> and sentence. . . . Petitioner did provide names of
> persons for [counsel] to contact prior to sentencing,
> including Susan Curry. [Counsel] followed-up and
> interviewed or tried to interview the persons Peti-
> tioner suggested. . . . The witnesses were not able to
> provide relevant useful mitigation information. **In
> fact, in many instances, the witnesses only pro-
> vided inculpatory and non-mitigating informa-
> tion**.

(Emphasis in original.) The district court rejected the conten-
tion that counsel had improperly failed to present mitigating
evidence concerning drug use. It also found that counsel's
performance was not deficient in failing to present expert tes-
timony on methamphetamine intoxication at the time of the
crime because "there was no lay witness testimony to support
Petitioner's intoxication at the time of the crimes." In addi-
tion, the district court rejected challenges to counsel's limited
investigation of Correll's family background. It concluded

that information concerning incest in the family was not available to counsel because neither Correll nor any of the family members that counsel interviewed provided him with any information. The district court also concluded that counsel "was not deficient in failing to present evidence corroborating the child abuse allegations because such corroborating testimony was not reasonably available to, and thus could not have been obtained by [counsel] at sentencing." As to the charge that Correll suffered from his mother's religious fanaticism, the district court concluded that counsel had the available information regarding Petitioner's mother being a Jehovah's Witness, but reasonably chose to present such evidence as an abandonment issue.

Thus, as indicated by Judge O'Scannlain's dissent, a review of the district court's 109-page memorandum of decision and order, although confirming that counsel provided deficient representation when he failed to seek documents relating to Correll's mental health and medical conditions, also shows that counsel's efforts on behalf of his client were considerably more nuanced than implied by the panel majority.

## II

The panel majority alleges that defense counsel basically abandoned his client at sentencing because Arizona law, as it then existed, mandated the death penalty when a defendant had a qualifying prior conviction, and there was no mitigating evidence. Indeed, this would be a much easier case if this assertion were true. However, it misstates the law in a critical manner, and implies the existence of clearly mitigating evidence where no clearly mitigating evidence exists.

The Arizona Supreme Court affirmed Correll's conviction, the presence of three aggravating circumstances, and his sentence.[1] The Arizona Supreme Court did not find that counsel had abandoned Correll. Rather it held:

---

[1]It should be noted that the majority does not suggest that any investigation or effort by counsel could have prevented the Arizona courts' finding three aggravating factors.

> The trial court found no mitigating circumstances which called for leniency. Defendant offered five mitigating circumstances: upbringing, cooperation in preparation of the pre-sentence report, psychological problems such that he did not understand the wrongfulness of his conduct, his minor participation in the murders, and age. A.R.S. § 13-703(G) provides that any relevant mitigating circumstance proffered must be considered in determining whether to impose the death penalty. We find that none of these factors, alone or in combination, are sufficiently substantial to call for leniency.

*State v. Correll*, 148 Ariz. at 482. Later in its opinion, after affirming the existence of three aggravating factors, the Arizona Supreme Court noted that it had "also considered the mitigating circumstances offered by defendant, and [ ] conclude[d] that even in combination the mitigating circumstances are not sufficiently substantial to call for leniency." *Id.* at 483. Thus, it appears that Arizona law did not mandate the death penalty, but required that the courts determine whether there were factors that were "sufficient to call for leniency." Furthermore, the Arizona Supreme Court's opinion rebuts the panel majority's suggestion that counsel had abandoned Correll at the sentencing hearing.

In addition, much of the majority's criticism of counsel's performance fails to recognize the critical difference between raising reasonable doubt as to the prosecutor's case for the death penalty and presenting affirmative evidence of mitigating circumstances. In *Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004), we recognized the validity of the lingering-doubt defense at the penalty phase, particularly as it "did not require introduction of mitigating evidence that would open the door to damaging rebuttal evidence." *Id.* at 624. We wrote:

> based upon our review of the reasons underlying [counsel's] penalty-phase strategy, we cannot fault

[counsel's] sound tactical decision to present a lingering-doubt defense in lieu of a defense based upon mitigating evidence of Williams's family and life history, drug use, or mental state. We note in this regard that the defense of " 'residual doubt has been recognized as an extremely effective argument for defendants in capital cases.' " *Lockhart v. McCree,* 476 U.S. 162, 181, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (quoting *Grigsby v. Mabry,* 758 F.2d 226, 248 (8th Cir. 1985) (en banc) (Gibson, J., dissenting)). A comprehensive study on the opinions of jurors in capital cases concluded:

> 'Residual doubt' over the defendant's guilt is the most powerful "mitigating fact." . . . [T]he best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking. The best thing he can do, all else being equal, is to raise doubt about his guilt.

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?,* 98 Colum. L. Rev. 1538, 1563 (1998) (footnote omitted); *accord* William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases*, 15 Am. J. Crim. L. 1, 28 (1988) ("The existence of some degree of doubt about the guilt of the accused was the most often recurring explanatory factor in the life recommendation cases studied.").

*Williams*, 384 F.3d at 624.

Here counsel represented a client who insisted on his innocence.[2] Under such circumstances, a lingering-doubt defense

---

[2]The district court noted:

Based on Petitioner's continuing claim of innocence and Petition-

was not only reasonable, but in light of then existing Arizona law and the double-edged nature of the so-called "classic mitigating evidence," perhaps the only reasonable approach available.

## III

It follows that because Arizona law did not mandate the entry of the death penalty and counsel did not abandon Correll, the second prong of the *Strickland* test for ineffective assistance of counsel cannot be presumed. Indeed, the purposes of the district court's nine-day evidentiary hearing was to determine whether the evidence that counsel failed to discover could possibly have been "sufficiently substantive to call for leniency." What the district court found, and the majority does not really dispute, is that there was no evidence that might humanize Correll or portray Correll as sympathetic. Rather, the evidence concerning Correll's sociopathic or antisocial personality disorder, drug use, and troubled family was double-edged. Although the evidence might offer some explanation for Correll's criminal acts, the evidence would also shed light on his prior criminal acts, violent tendencies, and unremorseful attitude. The Supreme Court has held that evidence of a troubled upbringing and mental issues can be mitigating. *See Rompilla v. Beard*, 545 U.S. 374, 392-93 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534-35 (2003). However, such evidence is also recognized to be double-edged, and it can be a reasonable strategic choice not to present such evidence. *Williams*, 384 F.3d at 619-20.[3] This case

---

er's failure to prove otherwise, the Court concludes that Petitioner did not discuss or attempt to help [counsel] prove that he was intoxicated when he committed the crime or that his condition at that time of the crimes would mitigate his sentence.

[3]In *Williams*, we stated:

The Supreme Court and this court have consistently held that counsel's performance is not deficient for the failure to present

requires a determination of whether the mitigating evidence could have been sufficiently substantial to call for leniency. In other words, whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

This question must be asked in the context of Arizona law as it then existed. When Correll was tried, the death penalty was not the province of a jury, but the responsibility of the trial judge and the Arizona Supreme Court. Accordingly, the inquiry is not whether a juror might possibly have been moved to alter his or her view of the case, but whether there is a reasonable possibility that any of the mitigating evidence would have changed the trial judge's or the Arizona Supreme Court's positions.

## IV

By not asking this question, the panel majority fails to appreciate that Correll has not, and cannot, meet the second prong of the *Strickland* test for ineffective assistance of counsel. Instead the majority (a) improperly substitutes its view of the evidence for the district court's findings, (b) fails to appre-

---

evidence in mitigation at the penalty phase when counsel's decision is based upon a reasonable tactical determination that the mitigating evidence would allow for the introduction of rebuttal evidence 'that might be literally fatal.' *Burger* [*v. Kemp*], 483 U.S. [776,] at 791-94, 107 S.Ct. 3114 [(1987)] (counsel's failure to present any mitigating evidence, including the defendant's own testimony or the testimony of the defendant's mother that he had an exceptionally unhappy and physically abusive childhood, or the expert testimony of a psychologist, was reasonable professional judgment because the testimony would risk bringing before the jury evidence of the defendant's unremorseful attitude, violent tendencies, and prior criminal acts).

384 F.3d at 619-20.

ciate Arizona's death penalty provisions that were in existence when Correll was tried, and (c) ignores the fact that presentation of the alleged "classic mitigating evidence" would have opened the door to overwhelmingly damaging rebuttal evidence.

**A.** The panel majority's improper substitution of its independent analysis of the record is well presented in Judge O'Scannlain's dissent; however, its treatment of two issues — Correll's alleged brain injury and the allegation that he was under the influence of drugs at the time of the crimes — illustrates the extent to which the majority's conclusions differ from the evidence in the record and the district court's perspective.

Addressing Correll's alleged brain injury, the panel stated:

> When Correll was seven, a brick wall collapsed on his head. Although he was unconscious for some time after the accident, his parents did not seek medical treatment until several days later when he was still not back to normal. Several experts testified that this type of accident and the symptoms Correll exhibited then and now indicate a high likelihood of brain impairment.

The district court, however, made the following findings:

> Petitioner received a head injury on April 8, 1967, when he was 7, at which time his parents took him to see their family doctor. Four days later, Petitioner was vomiting and again taken to the family doctor where an X-ray was taken and an EEG scheduled. On April 14, 1967, an EEG was done. On April 15, in response to more vomiting, Petitioner's parents took him to the emergency room at Children's Hospital of Los Angeles. At the hospital, he was seen by a treating physician, who diagnosed a subgaleal

hematoma, which is a bruise or collection of blood under the scalp, but above the skull. The treating physician recommended a neurosurgery consultation, which was done. The doctor in the neurosurgery clinic also diagnosed Petitioner with a subgaleal hematoma. On May 3, 1967, Petitioner was brought back to the neurosurgery clinic for a follow-up visit. The follow-up visit noted that Petitioner's hematoma cleared in 5 days and that Petitioner was alert and well.

In addition, the record indicates that when Correll was examined by experts around 2000, his brain functioned at a high level, although there was some evidence of impairment in the prefrontal lobe.[4] Also, there was little in the record to connect the alleged impairment in 2000 to the 1967 accident. The district court, having had the benefit of hearing from both parties' neuropsychologists, concluded that Correll did not suffer any brain injury from the 1967 accident.

The majority, however, chastises the district court for making such a finding asserting that it should "have decided only whether there existed a 'reasonable probability' that 'an objective fact-finder' in a state sentencing hearing would have concluded that Correll had a brain injury that impaired his judgment at the time of the crimes." But the majority's correction of the standard cannot change the fact that the district court determined that there was no reasonable probability that a fact-finder would find that Correll had a brain injury that impaired his judgment, and that the majority, rather than defer to this reasonable perspective, improperly substitutes its view of the record for that of the district court.

---

[4]The district court noted that Dr. Martell, a neuropsychologist, testified that this mild impairment did not "have a lot of import for [Correll's] everyday behavior" and that "of all the capital defendants he has tested, [Correll] is one of the highest functioning defendants."

The majority's myopic view of the record also allows it to conclude that "the evidence of Correll's methamphetamine use on the night of the crimes, had it been fully presented, could have risen to the level of a statutory mitigator." The majority states that there was undisputed evidence induced that Correll was addicted to methamphetamine and had used it on the day of the crime, and further relies on expert testimony "that gross methamphetamine intoxication, unlike gross alcohol intoxication, is not necessarily apparent to outside observers."

The majority's conclusion cannot be reconciled with Arizona law at the time of the crimes and the evidence in the record. As noted by Judge O'Scannlain, Arizona law provided "[a] defendant's intoxication or alcoholism at the time of the offense is a mitigating circumstance *if* the evidence shows that it significantly impaired the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." *State v. Zaragoza*, 659 P.2d 22, 30 (Ariz. 1983) (emphasis added).

The district court, after holding a nine-day evidentiary hearing, found:

> * due to Correll's continued maintenance of his innocence, Correll did not discuss his mental state with counsel and did not attempt to help counsel prove that he was intoxicated when he committed the crimes;
>
> * counsel interviewed the persons Correll indicated he was with prior to when the crimes were committed and they did not indicate that he was grossly intoxicated by alcohol abuse or drug abuse on the day of the crimes, but did indicate that Correll had been using methamphetamine prior to the day the crimes were committed;

\* "none of the witnesses could have testified that they observed Petitioner injecting methamphetamine in close proximity to the time the crimes occurred";[5]

\* the first thing that Correll and Nabors asked Snelling when they gained entry into his trailer home was whether he had any speed;

\* Correll had spent the vast majority of his life incarcerated in prison where his access to drugs was limited;[6]

\* Correll's self-reporting of drug use was severely limited due to the lack of corroboration;[7]

---

[5]The district court noted that at the evidentiary hearing, Robin Correll, petitioner's sister, testified that on the morning before the crimes she witnessed Correll inject some amount of methamphetamine. However, Robin did not testify at the trial. The district court explained:

> Had Robin testified about Petitioner's use of methamphetamine the day prior to the crimes, she could have been cross-examined about her knowledge of Petitioner's whereabouts at the time of the crimes. Had Robin testified concerning Petitioner's conversations about his need to leave town quickly, she would have disclosed that Petitioner was with John Nabors and had wanted an immediate ride out-of-state very soon after the murders occurred. Such testimony would have totally eliminated any mitigating weight from Petitioner's claim of innocence and residual doubt (i.e., the guilt phase misidentification defense).

[6]The district court noted that except for 229 days, Correll had been incarcerated for the 9-year period between October 1975 and March 1984, a month before the crimes.

[7]The district court concluded:

> The court does not credit Petitioner's unsubstantiated self-report that he abused methamphetamine every day before the crimes were committed. Petitioner chose not to testify at the evidentiary hearing; Petitioner chose not to fully cooperate with Dr. Matthews's examination regarding the issue of drug abuse. Because of the obvious motive to fabricate, Petitioner's self-serving statements about his drug usage prior to the crimes is unreliable and subject to searching skepticism.

\* Correll's expert's testimony was "thoroughly impeached" because he admitted that he only minimally considered the facts of the crimes before reaching his conclusion, he admitted that the facts did not necessary establish that Correll had prominent hallucinations or delusions, and the facts of the crimes show that Correll "was involved in deliberate acts, planning, conspiring, avoiding detection, awareness of wrongdoing, and that he was oriented to time, place and reality."

\* the determination by Arizona's expert in addiction that Correll was not in a substance abuse psychosis was credible because "he utilized the facts of the case to support his opinion and tied his opinion to the facts of the case;"

\* "the evidence shows that it was Petitioner who remained calm when the gun misfired as Nabors was trying to kill Robin Cady. It was Petitioner who encouraged Nabors to remain calm as there were no cars coming, to get a shell chambered and shoot Cady. Such behavior at the time of the crime does not demonstrate intoxication and, in fact, undercuts an assertion of intoxication."

Accordingly, the majority's assertions that there is a reasonable probability that a fact-finder could have found that Correll had a brain injury or that he was intoxicated by drugs at the time of the crimes are not supported by the record. More importantly, the majority's reweighing of the evidence violates our established law of deferring to the district court's findings. *Hovey*, 458 F.3d at 900 ("[F]actual findings made by the district court are reviewed under the 'significantly deferential' clearly erroneous standard, in which we accept the district court's findings of fact absent a 'definite and firm

conviction that a mistake has been committed.' ") (citations omitted).[8]

Here, the district court held a nine-day evidentiary hearing and made detailed findings of fact on remand from this court. We abuse our role as an appellate court when we cavalierly ignore the findings that a district court makes on remand. Again, the question is not whether reasonable minds might differ, but whether a review of the record creates "a definite and firm conviction that a mistake has been committed."[9] The majority, in pursuing "some mitigating evidence [that] could have spared Correll's life," fails to appreciate — as it is required to — that the district court's contrary position is reasonable and entitled to deference.

**B.** Although counsel's decision not to investigate Correll's medical and psychiatric records fell below an acceptable level of competence, his underlying reasons may be relevant to a determination of whether the failure to investigate was prejudicial. The district court explained defense counsel's perspective as follows:

---

[8]Our deference to the district court's factual findings did not arise in *Hovey*, 458 F.3d at 900, but is of a longstanding principle of habeas review. *See Silva v. Woodward*, 279 F.3d 825, 835 (9th Cir. 2002) ("[O]ur review for clear error is 'significantly deferential,' in that we must accept the district court's factual findings absent a 'definite and firm conviction that a mistake has been committed.' "); *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000) ("Clearly erroneous review is 'significantly deferential,' requiring that the appellate court accept the district court's findings absent a 'definite and firm conviction that a mistake has been committed.' "); *McMillan v. United States,* 112 F.3d 1040, 1044 (9th Cir. 1997) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602 . . . (1993).).

[9]In *Hayes v. Woodford*, 301 F.3d 1054, 1067 n.8 (9th Cir. 2002), we noted that "[t]o be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must, as one member of this court recently stated during oral argument, strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." (internal quotation omitted).

> [Counsel] estimated that Petitioner had one chance in twenty for a life sentence if he did not present the psychological diagnosis but only one chance in fifty if he presented Petitioner's psychological diagnosis to Judge Howe [the trial judge]. . . . Rather than argue Petitioner's personality disorder to Judge Howe, [counsel] decided that Petitioner had a better chance to avoid the death penalty if he portrayed that Petitioner was involved in a drug ripoff which had gone terribly wrong, that Petitioner had only been a follower in the matter, that he had not been the trigger-man as to the three people who died, that Gary Snelling had reported to police that Petitioner was under the influence of drugs and/or alcohol at the time of the crimes, and that he should be shown sympathy because his family abandoned him at the age of 14. . . . [Counsel] concluded that any psychological diagnosis of Petitioner could not be presented and argued without producing witnesses and other evidence that might destroy any residual doubt arising from the presentation of his misidentification defense at trial and the mitigation theory [counsel] intended to present regarding Petitioner being only a follower in the drug mishap and not the trigger-man.

The district court further explained:

> [Counsel] acknowledged that Judge Howe would consider and give effect to constitutionally relevant mental health evidence, but believed that once Judge Howe knew Petitioner's diagnosis, he would find it easier not to show sympathy and sentence him to death. . . . Likewise, [counsel] did not believe that Judge Howe would give substantial mitigating weight to antisocial personality disorder evidence. . . . On the other hand, [counsel] did believe that there was some possibility that Judge Howe might

give Petitioner a break for not being the trigger-man in the murders.

Although the panel majority opines that defense counsel "was afraid of the sentencing judge," a review of the record indicates that counsel's evaluation of Judge Howe's outlook was probably accurate and definitely reasonable. Furthermore, the panel majority's criticism of counsel's focus on Judge Howe ignores that under existing Arizona law, it was Judge Howe who was responsible for sentencing Correll. If Judge Howe imposed the death sentence, the Arizona Supreme Court would review that decision. However, if Judge Howe had declined to impose the death sentence, it is doubtful that Arizona or the Arizona Supreme Court could have, or would have, sought to change that decision.[10]

**C.** Perhaps the most critical factor, which is not really denied by the majority, is that the introduction of the "classic mitigating circumstances" would open the door to the admission of overwhelming negative evidence. The district court explained:

> Although the Court has attempted to recount the mitigation evidence presented at Petitioner's evidentiary hearing in detail, the bottom line is clear: a strategy of presenting Petitioner's emotional and mental

---

[10]The majority dismisses counsel's perspective concerning Judge Howe by labeling it a presumption that "the judge would not follow the law." The district court, however, specifically rejected the suggestion that Judge Howe would not follow the law. Rather, counsel thought that if Judge Howe found out that Correll was a sociopath or psychopath, he was more likely to sentence him to death. The district court found counsel's perspective to be credible. Moreover, Judge Howe's alleged perspective does not appear to be either irrational or illegal. In *Strickland*, the Supreme Court recognized that the trial judge's known views could be considered by counsel. 468 U.S. at 699. The trial judge's views were particularly important in Correll's case as three aggravating circumstances were established beyond dispute and a life sentence depended on Judge Howe finding sufficient mitigating circumstances to warrant leniency.

problems, his condition at the time of the crime, or as a victim of an abusive and tragic upbringing, would have required the following additional disclosures of facts, none of which are "mitigating:" (i) Petitioner's rape of a female psychotic patient while he was undergoing mental health treatment for his antisocial personality disorder and mild depression . . . ; (ii) Petitioner's numerous escapes from mental health treatment facilities and rejections of institutional efforts to provide him with mental health treatment . . . ; (iii) Petitioner's hostage taking and armed aggression against mental health workers in an escape attempt from a mental health treatment facility . . . ; (iv) the underlying factual basis of Petitioner's prior conviction for armed robbery . . . ; (v) the revelation that, shortly after the murders were committed, Petitioner and Nabors woke up Robin Correll and informed her that they needed a ride out-of-state right away . . . ; (vi) Petitioner's lack of effort to seek any type of treatment for his substance abuse problem . . . ; (vii) Petitioner's acts of regularly molesting his sister Robin . . . ; (viii) the conclusion of the social evaluation at age 18 that Petitioner was not a candidate for probation and was a danger to the community . . . ; (ix) additional information showing the efforts of Petitioner's parents to deal with his drug abuse problem and obtain psychological treatment for him following his armed threat against a teacher at school . . . ; (x) that Petitioner had no desire to work but only wished to enjoy himself . . . ; and (xi) Petitioner's statement that when he committed the 1978 armed robberies that it gave him a strong sense of power and excitement . . . .

The district court also agreed with counsel that the prosecutor "had a reputation of excellent preparation and that she would have left no stone unturned in her opportunity to rebut any mitigation evidence presented."

The panel majority seeks to minimize the negative impact of this evidence by suggesting that a "significant portion" of the "damaging rebuttal evidence was already available through the pre-sentence report." This is a misleading over-statement. Such facts as Correll's molestation of his sister, his use of minors to facilitate armed robberies, and his rape of a psychotic female patient were not set forth in the pre-sentence report. Moreover, as has already been noted, there is a world of difference between raising questions as to the sufficiency of the State's presentation and introducing "mitigating evidence that would open the door to damaging rebuttal evidence." *Williams*, 384 F.3d at 624.

Regardless of how much of the negative evidence was already before the trial court, the inquiry remains whether further presentation of the evidence would have been substantial enough to mitigate a death sentence.[11] The majority does not really take issue with the district court's determination that Correll, at most, had an antisocial personality disorder, and that there was "insufficient evidence to support that [Correll] has ever suffered from any major mental illness, whether PTSD, a major depressive disorder, or a bipolar disorder." Instead, the panel majority opines that the damaging rebuttal evidence "could, in the hands of a competent attorney, have been used to support Correll's claims of dysfunctional upbringing and continuing mental disorder." This may be true in the abstract, but in light of the horrific nature of the crimes, Correll's defense of innocence, the extant standard for the imposition of the death penalty, and the damaging rebuttal evidence, the majority engages in wishful thinking.

Here we are concerned with the possible impact of damaging rebuttal evidence on Judge Howe and the Arizona

---

[11]Ironically, the panel majority's suggestion that the evidence was in the pre-sentence report would appear to weigh against its conclusion that the presentation of the evidence would have made a difference.

Supreme Court. The district court properly noted that the standard is high:

> Based on both the horrific facts surrounding these murders and [Correll's] prior criminal history, this is the type of case that demands powerful mitigation before it may be said that confidence in the outcome at sentencing has been undermined. *See Bonin v. Calderon*, 59 F.3d 815, 836 (9th Cir. 1995); *see also Gerlaugh v. Stewart*, 129 F.3d 1027, 1042-43 (9th Cir. 1997) (horrific crime facts require substantial mitigation before it may be said that the balance of aggravating factors did not warrant death); *Campbell* [*v. Kincheloe*], 829 F.2d [1453,] 1464 [(9th Cir. 1987)] (overwhelming aggravating factors and the heinous nature of the crime required more than insubstantial mitigation to establish prejudice).

Also, Arizona argues that under Arizona law:

> Correll's personality disorder, his alleged drug addiction, his past psychological and medical history, and his dysfunctional family, as non-statutory mitigators, are not entitled to any significant mitigating weight, because Correll failed to demonstrate any causal nexus between these mitigators and the crimes he committed. [*State*] *v. Murdaugh*, 209 Ariz. 19, 35 . . . (2004) (drug impairment, personality disorder, and paranoia not entitled to significant mitigating weight because there was no proven causal nexus between them and the defendant's crimes); [*State*] *v. Hoskins*, 199 Ariz. 127, 151-53 . . . (2000) (antisocial or borderline personality disorder, and dysfunctional family, not mitigating in absence of causal link to crime.).

Furthermore, even the panel majority does not question that the state proved three aggravating factors. In light of the hor-

rific nature of the murders, the reasonably perceived nature of the trial judge's jurisprudence, and the incredibly damaging nature of some of the rebuttal evidence, it is not reasonable to conclude that the admission of the evidence would have had any mitigating impact on either Judge Howe or the Arizona Supreme Court.

## V

This case presents an instance in which counsel's instinct that an investigation into Correll's medical and mental history would not yield any positive evidence, although an unacceptable reason for not conducting an investigation, turns out after 17 years, a full investigation, and a 9-day evidentiary hearing, to have been correct. The panel majority does not really deny that there is no positive evidence, but argues that evidence concerning Correll's alleged brain damage, sociopathic or antisocial personality disorder, drug use, and troubled family, constitute "classic mitigating circumstances." The second prong of the *Strickland* test, however, does not call for an abstract analysis of what might be mitigating evidence, but a determination of whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The Supreme Court reiterated this standard in *Woodford v. Visciotti*, 537 U.S. 19, 22 (2002), when it reversed this court for failing to defer to the California Supreme Court's determination that trial counsel's inadequacy was not prejudicial.[12]

---

[12]The Supreme Court's description of the California Supreme Court's determination — that it held we had improperly failed to accept — bears an uncanny resemblance to the district court's determination in this case. The Supreme Court noted:

> The California Supreme Court concluded that despite the failure to present evidence of respondent's "troubled family background," which included his being "berated," being "markedly

Moreover, in *Allen v. Woodford*, 395 F.3d 979 (9th Cir. 2005), we first found that "counsel's failure to prepare for the sentencing phase until a week before that phase began, and his resulting failure to thoroughly investigate and present Allen's mitigation case, was constitutionally deficient," *id.* at 1002, but denied relief because we could not "conclude that there is a reasonable probability, had trial counsel presented the potential mitigation evidence developed during habeas, that the jury would have weighed the evidence in favor of a life sentence." *Id.* at 1005. Although *Allen* presented a very different factual situation, it does require that we look beyond the fact of counsel's deficient performance to determine whether it had any effect on the result.

The record in this case clearly shows that the presentation of evidence of Correll's alleged brain damage, sociopathic or antisocial personality disorder, drug use, and troubled family would not have made any difference to the trial judge or the Arizona Supreme Court. This conclusion is solidly based on the horrific nature of the murders, the applicable constitutional and state law as it existed when Correll was tried, the perceived nature of the trial judge's jurisprudence, and the incredibly damaging nature of the rebuttal evidence. It is one

---

lacking in self-esteem and depressed," having been "born with club feet," having "feelings of inadequacy, incompetence, inferiority," and the like, moving "20 times" while he was growing up, and possibly suffering a "seizure disorder," the aggravating factors were overwhelming. In the state court's judgment, the circumstances of the crime (a cold-blooded execution-style killing of one victim and attempted execution-style killing of another, both during the course of a preplanned armed robbery) coupled with the aggravating evidence of prior offenses (the knifing of one man, and the stabbing of a pregnant woman as she lay in bed trying to protect her unborn baby) was devastating. The California Supreme Court found these aggravating factors to be so severe that it concluded respondent suffered no prejudice from trial counsel's (assumed) inadequacy.

*Woodford*, 537 U.S. at 26 (citations omitted).

thing to cast about for alternate theories after the imposition of the death penalty, and an entirely different thing to argue that a defendant who has been convicted by a jury of first-degree murder should *not* receive the death penalty because he is a sociopath who cannot control himself. Correll's counsel thought that there was a one in twenty chance that Judge Howe would not impose the death penalty if the murders were presented as the result of a "routine robbery, drug rip off that went bad." The presentation of further evidence of Correll's mental and medical records, antisocial behavior, and prior crimes — far from eliciting sympathy — would have rendered a death sentence a certainty rather than a probability.

The panel majority's opinion is not only factually wrong, but more importantly for Ninth Circuit law, fails to follow the standard for ineffective assistance of counsel mandated by the Supreme Court and followed in our prior cases. First, instead of fairly asking separately whether counsel's performance was deficient and whether the deficient performance was prejudicial, the opinion collapses the two standards into a single inquiry of whether counsel's performance was deficient. In other words, it in effect allows a finding of a deficient strategic decision to carry an irrebuttable presumption of prejudice. Second, it fails to recognize that even assuming that a presumption of prejudice may arise from a determination of deficient performance, here the presumption was rebutted. It does this by insisting that there were "classic mitigating circumstances," without acknowledging the seriously damaging nature of this evidence.[13]

The panel majority's opinion makes it almost impossible for defense counsel in a death penalty to render effective assistance of counsel. Where, as here, defense counsel recognizes that what might arguably be mitigating evidence is also

---

[13]As previously noted, we have held that the double-edged nature of arguably mitigating evidence may justify a decision not to present such evidence. *Williams*, 384 F.3d at 619-20.

damaging, he or she faces an impossible decision. If counsel decides to forego presentation of the evidence, counsel's performance may be subsequently determined to be ineffective because the choice was prejudicial (the client received the death penalty). If defense counsel proffers the controversial evidence, and the client gets the death penalty, counsel will be chastised for introducing evidence that was prejudicial to the client. Moreover, every criminal defendant who persuades a court that his or her counsel was ineffective will argue that if the deficiency was prejudicial in this case, it must be prejudicial in his or her case. Because the panel majority misconceives the *Strickland* standard for ineffective assistance of counsel and then applies it in such a way as to suggest an irrebutable presumption of prejudice from a counsel's deficient strategic decision, I dissent from our decision not to rehear this matter en banc.

## OPINION

THOMAS, Circuit Judge:

Michael Emerson Correll, an Arizona inmate sentenced to death, appeals the district court's denial of his petition for writ of habeas corpus following our remand for an evidentiary hearing. We reverse.

### I

This capital case arises under a federal habeas corpus provisions that have been supplanted by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), and a state capital sentencing statute that has since been repealed.

The factual history of this case was detailed in our earlier opinion, *Correll v. Stewart*, 137 F.3d 1404, 1408-10 (9th Cir.

1998) ("*Correll I*"). Briefly, Correll was convicted by an Arizona jury in 1984 of first degree murder, attempted first degree murder, kidnapping, armed robbery, and first degree burglary, all for his role in a triple homicide. *Id.* at 1408. He was sentenced to death by the trial judge, *id.* at 1410, and the Arizona Supreme Court upheld his conviction, *State v. Correll*, 715 P.2d 721 (Ariz. 1986). The Supreme Court, however, modified his death sentence as to one of the victims and invalidated one aggravating factor. *Id.* at 730-31; 734-35.

In 1987, Correll timely filed a petition for post-conviction relief pursuant to Arizona Rule of Criminal Procedure 32. In this petition, Correll asserted multiple violations of his constitutional rights, including his right to the effective assistance of counsel during the guilt and penalty phases of his trial, his right to confrontation, and his right to reliability in capital sentencing. Correll later filed five supplements to his petition, adducing evidence of his mental impairment and his attorney's ineffectiveness. The Arizona trial court summarily dismissed Correll's petition and subsequently denied Correll's motion for rehearing. The Arizona Supreme Court denied review without comment.

Correll subsequently filed a petition for writ of habeas corpus in federal district court under 28 U.S.C. § 2254. Correll alleged fifty-three constitutional violations at trial, at sentencing, and during the appellate process. The district court determined that twenty-six of Correll's claims were procedurally barred, then granted summary judgment against Correll on his remaining constitutional claims.

On appeal, we affirmed all of the district court's order except as to Correll's contention that he was entitled to an evidentiary hearing on his claim of ineffective assistance of counsel at sentencing. *Correll I*, 137 F.3d at 1420. We remanded that issue to the district court with instructions to hold an evidentiary hearing. *Id.*

On remand, the district court conducted a nine day evidentiary hearing. Applying the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, the district court concluded that the performance of Correll's attorney at sentencing was deficient but that Correll had suffered no prejudice. The district court therefore granted judgment against Correll on his federal habeas corpus petition. This timely appeal followed.

Because Correll's petition for a writ of habeas corpus was filed before the effective date of AEDPA, pre-AEDPA law governs our consideration of the merits. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1494 (9th Cir. 1997) (en banc). Under pre-AEDPA law, we consider a claim alleging ineffective assistance of counsel as a mixed question of law and fact, which we review *de novo*. *Rios v. Rocha*, 299 F.3d 796, 799 n.4 (9th Cir. 2002). We review the district court's denial of Correll's habeas petition *de novo* and the district court's factual findings for clear error. *Id.*

## II

**[1]** As the Supreme Court has long instructed, the Sixth Amendment right to counsel in a criminal trial includes "the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). This right extends to "all critical stages of the criminal process," *Iowa v. Tovar*, 541 U.S. 77, 80-81 (2004), including capital sentencing, *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002). "Because of the potential consequences of deficient performance during capital sentencing, we must be sure not to apply a more lenient standard of performance to the sentencing phase than we apply to the guilt phase of trial." *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992).

Under the familiar *Strickland* standard, to prevail on his claim of ineffective assistance of counsel during the penalty

phase of his trial, Correll must demonstrate first that the performance of his counsel fell below an objective standard of reasonableness at sentencing and, second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. Under *Strickland*, we measure an attorney's performance against an "objective standard of reasonableness," calibrated by "prevailing professional norms." *Id.* at 688.

There are two aspects of Correll's penalty phase defense that are at issue in this appeal: the investigation of possible defenses and the presentation of valid ones.

A

**[2]** Counsel has a duty at penalty phase "to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.' " *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) (quoting *Williams*, 529 U.S. at 399) (alterations in original). When it comes to the penalty phase of a capital trial, "[i]t is imperative that all relevant mitigating information be unearthed for consideration." *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999), *as amended*.

The ABA Standards for Criminal Justice provide guidance as to the obligations of criminal defense attorneys in conducting an investigation. *Rompilla v. Beard*, 545 U.S. 374, 387, 125 S.Ct. 2456, 2466 (2005); *Williams*, 529 U.S. at 396. The standards in effect at the time of Correll's capital trial clearly described the criminal defense lawyer's duty to investigate, providing specifically:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.).

As measured against these prevailing professional norms, there can be little doubt that Correll's penalty phase counsel fell below an objective standard of reasonableness.

**[3]** First, Correll's attorney did little to counsel Correll about potential mitigating arguments, even though "[a]dequate consultation between attorney and client is an essential element of competent representation of a criminal defendant." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983) (citation omitted). Correll alleges that defense counsel met with him only once, for five minutes, between trial and sentencing. *Correll I*, 137 F.3d at 1412. At the evidentiary hearing, his attorney contradicted that allegation, testifying that he met with Correll "[p]robably two or three times." Based on the attorney's testimony, the district court rejected Correll's assertion of minimal consultation, specifically finding that Correll's attorney "did maintain regular contact with Petitioner prior to sentencing."

The record, however, reveals that the district court's finding of adequate consultation was clearly erroneous. Even if counsel's efforts to communicate with Correll exceeded one five-minute meeting, his penalty phase consultation was

unreasonably limited. Indeed, Correll's attorney was not even confident that he had met with Correll more than once; he testified, "I know definitely one time that I can recall, but I think probably two or three times." His hand-written notes from the time period confirm only two meetings. More importantly, the attorney's notes make clear that Correll failed to grasp the significance of the sentencing hearing and that his attorney made, at best, minimal efforts to explain it to him. In fact, Correll asked to be sentenced as soon as possible so that he could go to the Department of Corrections in time to pick up a Christmas package, and his attorney acquiesced in that request. At no point did Correll's counsel explain to Correll the possibility of a mitigation defense arising from Correll's drug use, brain damage, family history, or psychiatric record, and at no point did counsel ask Correll for information or contacts specifically related to those issues. We therefore conclude that the district court's factual finding on this issue was clearly erroneous and that the district court's legal conclusion was in error. Correll's attorney did not maintain constitutionally adequate contact or engage in constitutionally adequate consultation with Correll in between conviction and sentencing.

**[4]** Second, penalty phase investigations in capital cases should include inquiries into social background, including investigation of any family abuse, mental impairment, physical health history, and substance abuse history. *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (en banc). That investigation should include examination of mental and physical health records, school records, and criminal records. *Id.* "Defense counsel should also personally review all evidence that the prosecution plans to introduce in the penalty phase proceedings, including the records pertaining to criminal history and prior convictions." *Id.* (citing *Rompilla*, 125 S.Ct. at 2465). In this case, although defense counsel was aware that potential mitigating evidence existed, he did not explore any avenues that might lead to development of that evidence.

**[5]** The district court excused defense counsel's failure to investigate many of these mitigating factors on the ground that Correll "had not informed" his attorney of the various "allegations" that amounted to classic mitigating circumstances. On that basis, the district court apparently concluded that defense counsel was unaware of — and could not investigate — many of the mitigating factors that Correll proffered during the evidentiary hearing. Although the district court was apparently right to conclude that Correll did not specifically inform his counsel of some mitigating factors, the court's implicit conclusion that the attorney was ignorant of those factors is clearly erroneous. When questioned during the mitigation hearing, Correll's trial counsel explicitly confirmed that he was aware of Correll's mental health disorders, psychiatric commitments, drug abuse history, brain injury, and family dysfunction. Defense counsel testified as follows:

> Q.  Were you aware that [Correll] had spent nearly his entire teen life, from ages 14 to 18, as a ward of the State of California and an inmate of the California Youth Authority?
>
> A.  Yes.
>
> . . .
>
> Q.  [T]hese [referring to exhibit] are notes from your first interview and your first meeting with Mr. Correll?
>
> A.  Yes.
>
> Q.  And you see there noted, don't you, that you learned of mental disorders. You checked the mental disorders box, and that he had been committed twice, and "in joint." Do you see that?

A.  Yes.

Q.  So you knew from the inception of this case that Mr. Correll had a couple of commitments to psychiatric or mental institutions?

[Objection colloquy omitted.]

THE WITNESS: Yes, I definitely knew that.

[Colloquy omitted.]

Q.  You also learned, during the course of your representation of Mr. Correll, that he had a rather lengthy drug abuse history, didn't you?

A.  Yes.

Q.  Did you also learn, during the course of your representation, that other of the Correll brothers had criminal records and themselves had been incarcerated in the Youth Authority?

A.  Yes.

Q.  Did you learn that his sister Robin was residing in a foster home?

A.  I believe I was aware of that. I don't recall at this point.

Q.  Did you then, conclude that there were problems of some description within the Correll household that may have contributed to the Correll childrens' [sic] poor record of success?

A.  Oh, it was obviously an extremely dysfunctional family.

This testimony makes perfectly clear that Correll's trial counsel was aware of many if not all relevant mitigating factors. The district court's implicit conclusion to the contrary was clearly erroneous.

Indeed, in light of the abundance of classic mitigation evidence of which counsel was aware, his almost complete failure to investigate is startling. Despite his knowledge that Correll was a drug user with an extremely troubled childhood, defense counsel did not interview witnesses about these issues or obtain records concerning these matters. The district court found that Correll's attorney "interviewed or tried to interview" about forty or fifty witnesses but that "[t]he witnesses were not able to provide relevant useful mitigation information." On that basis, the district court found that counsel's investigative efforts, at least with respect to the interviews, were adequate. Once again, the district court's factual finding and legal conclusion are clearly erroneous.

Admittedly, counsel did meet with some witnesses during the trial phase, including those members of Correll's family who would cooperate. But counsel testified that he met only once with Correll's father, sister, and brother, "around the kitchen table at the same time," and probably spent only "[a] couple hours" with them. Furthermore, Correll's counsel admitted that he interviewed witnesses only during the guilt phase, not during the sentencing phase. Although the attorney testified that he was looking for mitigation information as well as exculpatory information during those pre-trial interviews, he failed to ask any direct questions or to conduct any direct investigation related to the mitigating factors that are now at issue. When counsel was asked at the evidentiary hearing whether he had questioned the interviewees about Correll's drug abuse, head injury, psychiatric history, or family dysfunction, counsel testified that he asked no such specific questions but, rather, asked the interviewees simply to "tell [him] anything [they could] tell [him] that would help." As a result, counsel's interviews were substantively worthless.

Thus, his failure to gather mitigating information did not result from its unavailability; it resulted from counsel's complete failure to ask any relevant questions. The district court's conclusion to the contrary was clearly erroneous.

Additionally, trial counsel did not obtain records from Correll's schools or from psychiatric institutions, even though counsel admitted that those records may have contained mitigating evidence. Counsel also failed to obtain police reports on prior convictions and records regarding the time that Correll was in the custody of the California Youth Authority. Counsel did not obtain Correll's medical records, and he made no inquiry into whether an X-ray or other diagnostic test was performed to determine whether Correll suffered any brain injury following an incident in which a wall fell on Correll's head.

During the evidentiary hearing, counsel could not recall what efforts he made to gather Correll's psychiatric records, though he did remember that he failed to obtain records from Correll's stays at various mental health centers.[1] As the district court correctly concluded, counsel's failure to obtain these relevant records constituted deficient performance.

In sum, defense counsel's investigation into classic mitigators was extremely limited. Two of the district court's conclusions were clearly erroneous: that counsel was unaware of some mitigators and that counsel conducted sufficient interviews to investigate the mitigators of which he was aware. The district court correctly concluded that counsel failed to obtain relevant records that were available at the time. Taken together, this evidence demonstrates that counsel's investigation into classic mitigators was unreasonably limited — that counsel's penalty phase representation was constitutionally inadequate.

---

[1]As the district court found, some of these records were destroyed between the time of the trial and the time of the habeas investigation.

Of course, Correll's attorney was not wholly without a mitigation strategy. But the limited strategy that he developed was unreasonably constricted, and even with respect to that anemic strategy, counsel's investigative efforts were unreasonably weak.

Defense counsel testified that the principal mitigation evidence he sought was information that would show Correll as a "good person" and one who had "done good deeds." Such a limitation on the scope of the mitigation investigation was, in and of itself, unreasonable given the extreme unlikelihood that any testimony about Correll's character would have been sufficient to "humanize[ ] him during the time frame of the murder conspiracy at issue." *Allen v. Woodford*, 366 F.3d 823, 851 (9th Cir. 2004). Rather, as Correll's attorney knew at the time, the most likely type of evidence available was the type that would portray Correll as a "person whose moral sense was warped by abuse, drugs, [or] mental incapacity." *Id.*

Even assuming, however, that reliance on a character defense was a reasonable strategy in this case, counsel's investigation into character evidence was inadequate. For example, Correll's attorney was aware that a chaplain with the California Youth Authority, Reverend Curry, might have been willing to testify on Correll's behalf, but the attorney never even attempted to contact Reverend Curry.[2]

[6] Based on the foregoing, we conclude that Correll's counsel provided constitutionally deficient representation dur-

---

[2]The district court concluded that this failure was not prejudicial because Reverend Curry's employer did not permit him to testify on Correll's behalf. The district court, however, completely misunderstood Reverend Curry's testimony. The California Youth Authority prohibited Reverend Curry from initiating contact with Correll's attorney, but it did not prohibit him from appearing on Correll's behalf at the hearing. Reverend Curry testified repeatedly that he would have been happy to speak on Correll's behalf if Correll's attorney had initiated contact (which, again, he never did).

ing his investigation into possible mitigation defenses. The district court was correct in its limited holding that defense counsel failed to seek and obtain mental health and other medical records, and we further conclude that the rest of defense counsel's investigative efforts, including his contact and consultation with Correll, his interviews with relevant witnesses, and his development of a character-based mitigation strategy, were also constitutionally inadequate. Defense counsel's failure to investigate falls far short of any objective standard against which we might measure reasonable attorney performance under the Sixth Amendment.

## B

Compounding his errors during the investigative phase of sentencing, Correll's attorney then presented to the court virtually none of the little mitigating evidence that he had developed. "There is no more important hearing in law or equity than the penalty phase of a capital trial." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1050 (9th Cir. 1997) (Reinhardt, J., concurring and dissenting). At the penalty phase, a capital defendant has a "constitutionally protected right [ ] to provide the jury with . . . mitigating evidence." *Williams*, 529 U.S. at 393. "Failure to present mitigating evidence at the penalty phase of a capital case constitutes ineffective assistance of counsel." *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998).

[7] As anemic as the defense counsel's investigation was, his presentation of mitigating evidence at the penalty phase was worse. In fact, defense counsel put on no affirmative penalty phase defense whatsoever. He did not call a single witness to testify. He did not introduce any evidence. The state trial court record states: "Defendant waives presentation of mitigating evidence."

Indeed, the only proactive effort that Correll's attorney made at sentencing was to write a short response to the presentence report. In that written submission, he included a list

of mitigating arguments, but he did not support those arguments with any evidence, affidavits, or testimony. The entirety of the written submission in mitigation reads as follows:

A.  Defendant was under the influence of alcohol and drugs at the time the offenses were committed.

    Guy Snelling stated in an interview with police officers on April 12, 1984, that there was alcohol on the breath of Defendant at the time the offenses were committed. It is obvious from this and the conduct of the perpetrators, that they were under the influence of alcohol or drugs or both at the time the offenses were committed.

B.  Defendant was only a follower in the commission of the crimes.

    Guy Snelling stated in an interview with defense counsel on August 14, 1984 that it was clear that John Nabors was the leader of the two perpetrators and was making the decisions. This is further corroborated by the fact that it was John Nabors who knew Guy Snelling would have illicit drugs and money and therefore, John Nabors must have done the planning of the robbery.

C.  Prior to the robbery, there was no reason to believe that anyone would be present other than Guy Snelling, and therefore, there was no prior plan to kill Debra Rosen, Robin Cady or Shawn Di'Brito.

 D. Defendant has cooperated with the Adult Proba-
tion Office in the preparation of his presentence
report.

 E. Defendant's age.

Predictably, the Arizona Supreme Court and the federal dis-
trict court concluded that this mitigation argument was not
sufficiently significant to call for leniency.

**[8]** The anemia of counsel's mitigation presentation was a
critical error, certainly rising to the level of constitutionally
deficient representation. "The failure to present mitigating
evidence during the penalty phase of a capital case, where
there are no tactical considerations involved, constitutes defi-
cient performance, since competent counsel would have made
an effective case for mitigation." *Smith v. Stewart*, 189 F.3d
1004, 1008-09 (9th Cir. 1999).

**[9]** The error's full magnitude, however, does not become
apparent until we consider the effect it had under Arizona law
in particular. At the time of the penalty phase proceedings,
Arizona law mandated the death penalty if the trial judge
found any one of the enumerated aggravating factors and
determined that there were no mitigating factors that were
sufficiently substantial to call for leniency. Ariz. Rev. Stat.
§ 13-703 (1984). One of the enumerated aggravating circum-
stances is a previous violent felony, for which Correll unques-
tionably qualified. *State v. Correll*, 715 P.2d at 731. In
Correll's case, therefore, the failure to present any evidence
in mitigation "all but assured the imposition of a death sen-
tence under Arizona law." *Summerlin*, 427 F.3d at 640; *see
also Evans v. Lewis*, 855 F.2d 631, 637 (9th Cir. 1988) (not-
ing that in Arizona, once an aggravating circumstance like a
prior aggravated felony was found, death was inevitable with-
out mitigating evidence, and thus holding that the failure to
pursue psychiatric evidence constituted prejudicially deficient
performance).

In fact, the State argued five aggravating factors, and Correll's defense counsel disputed only a few of them. He disputed that the crimes were cruel, heinous, and depraved, and he argued that convictions for more than one homicide could not be used as an aggravating factor because the statute authorizing this factor was not in effect on the offense date. At the evidentiary hearing in the district court, he conceded that he thought "it was a veritable certainty" that the court would find "at least two, and probably all five of [the] aggravating factors." The court found four.

Defense counsel's sentencing memo does not even attempt to rebut three of the five aggravating factors urged by the State. In his oral presentation at sentencing, counsel mentioned the aggravating factors, but in form only, without any substantial legal position or evidentiary support. The entirety of his oral argument at the penalty phase consists of approximately 7 pages of transcript.

Given counsel's virtual concession of most of the aggravating factors argued by the State and his waiver of the presentation of mitigation evidence, the outcome was obvious: imposition of the death penalty. The Arizona Supreme Court, in re-weighing the aggravating and mitigating factors, found no mitigating factors "sufficiently substantial to call for leniency." *State v. Correll*, 715 P.2d at 735. The Court highlighted the lack of evidence presented in mitigation and noted that the "defendant has offered no evidence or expert testimony on which we could base a finding that he was unable to appreciate the wrongfulness of his conduct." *Id.* The Court was particularly dismissive of his attempt to count cooperation in the pre-sentence investigation as a mitigating factor, noting "[i]t is in defendant's interest to cooperate at sentencing; defendant should not be rewarded for self-serving acts." *Id.*

[10] In sum, Correll's counsel was constitutionally deficient in failing to investigate and present mitigating evidence.

Particularly in light of Arizona's death penalty regime, the failure to develop a robust mitigation defense — and the failure to defend against the State's aggravation case — was unreasonable, falling below any objective standard of adequate representation.

C

The State contends that the failure to put on penalty phase evidence was a strategic choice, protected under *Strickland*. To be sure, under *Strickland*, we must defer to trial counsel's strategic decisions. "A reasonable tactical choice based on an adequate inquiry is immune from attack under *Strickland*." *Gerlaugh,* 129 F.3d at 1033. However, to be considered a constitutionally adequate strategic choice, the decision must have been made after counsel has conducted "reasonable investigations or [made] a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. In addition, "[e]ven if [a] decision could be considered one of strategy, that does not render it immune from attack — it must be a *reasonable* strategy." *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1997) (emphasis in original). In this case, because of defense counsel's failure to investigate potential mitigation evidence, he had too little information to make any informed strategic decision. Furthermore, when considered objectively, his purported "strategy" cannot be considered reasonable.

1

**[11]** A decision by counsel not to present mitigating evidence cannot be excused as a strategic decision unless it is supported by reasonable investigations. *See Williams*, 529 U.S. at 394 (recognizing a constitutional right to present mitigating evidence to the jury); *Silva*, 279 F.3d at 843 (recognizing "the breadth of a criminal defendant's constitutional protection against his attorney's failure to investigate mitigating evidence when defending his client against a capital sen-

tence"). In *Wiggins*, the Supreme Court held that the traditional deference owed to the strategic judgments of counsel is not justified where there was not an adequate investigation "supporting those judgments." 539 U.S. at 521.

Here, as we have discussed, defense counsel failed to make a reasonable investigation into potential mitigating evidence. Therefore, his decision not to put on a mitigation case cannot be considered to be the product of a strategic choice. An uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all. *Cf. Strickland*, 466 U.S. at 690-91 (holding that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

In *Silva*, for example, we held that in the absence of diligent investigation, counsel cannot make a reasoned tactical decision regarding whether or not to present mitigating evidence. 279 F.3d 846-47. Indeed, we determined that even if a client forecloses certain types of mitigation evidence, "it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of [mitigating evidence]." *Id.*

**[12]** Here, an abundance of classic mitigation evidence existed. However, counsel failed to investigate these potential avenues and was therefore unable to make an informed decision as to whether to present the evidence and arguments that were available. His choice not to present mitigation evidence, therefore, cannot be justified as strategic.

2

To the extent that there was any strategy involved in the penalty phase presentation, it cannot be considered a reasonable strategy by any objective measure.

Defense counsel chose to rely on the pre-sentence report prepared by a state probation officer, despite his own charac-

terization of that report as "one-sided." During his short sentencing argument, defense counsel criticized the author of the pre-sentence report for failing to interview several people who could have provided mitigating statements. The irony, of course, is that defense counsel could have introduced during the penalty phase the very mitigating evidence that he felt the probation officer should have gathered.

The sentencing report described the crimes as "particularly heinous" and speculated that "the murder scene in the desert must have been particularly gruesome." The probation officer concluded that, given the circumstances of the crime, "[t]hey obviously planned the murders ahead of time and then calculatingly and unemotionally carried out their plans." The pre-sentence report described Correll's history as "a text book of psychopathology," and "riddled with instances of violent behavior and armed aggression." The probation officer determined that Correll "was not capable of functioning in society." The report concluded with the observation that "[h]e is a threat, a menace, and in my opinion, the community at large should never again be subjected to the risk of recurrence of this type of behavior." These statements are hardly the words of mitigation, and no competent capital defense counsel would have relied upon such a report as providing mitigation evidence, much less as the sole source of mitigation evidence.

[13] Defense counsel testified at the evidentiary hearing that he "was basically hoping [the judge] would think it was a one-time incident and want to give Mr. Correll a break and find a mitigating factor." However, the pre-sentence report contained explicit references to an extensive criminal history that belied this theory. Indeed, the page and a half of criminal convictions reported is longer than defense counsel's entire mitigation presentation in his sentencing memorandum. It was not a reasonable strategy to rely on the pre-sentence report to prove that the crime was a "one-time incident" when the entire report drew the opposite conclusion.

When asked at the evidentiary hearing, "what was your sentencing strategy," trial counsel responded that it was "hoping that [the judge] liked Mr. Correll" and hoping that the judge found that the crime "was a drug ripoff that went bad[,] that Michael was under the influence," and that "he wasn't the leader in the crimes." When pressed, however, defense counsel was forced to admit that portraying the crime as a one-time drug ripoff gone bad was not something that would constitute a mitigating factor.

Throughout the evidentiary hearing, defense counsel revealed a fundamental misconception of mitigation evidence. He referred to the sentencing hearing as "a dog and pony show" and "so much smoke." He said he felt that the judge would not have been receptive to mitigation evidence that was "touchy-feelly [sic] fuzzy-headed kind of stuff." When asked about the classic mitigation evidence that was available, such as potential brain injury,[3] a history of drug addiction, and abuse suffered as a child, counsel testified that he didn't think of the evidence as favorable evidence. However, it is precisely this type of evidence that the Supreme Court has deemed "powerful." *Wiggins*, 539 U.S. at 534.

It appears clear from examination of his testimony that defense counsel was afraid of the sentencing judge. In fact, he forewent psychological testing because he feared that the judge would learn of it, and he testified that he might have presented evidence of Correll's history of drug addiction had he been before a different judge.[4] He believed that the judge

[3]As the district court noted, the Arizona Courts place significant weight on brain injuries as mitigating evidence. Similarly, "[w]e have repeatedly held that counsel may render ineffective assistance if he is on notice that his client may be mentally impaired, yet fails to investigate his client's mental condition as a mitigating factor in a penalty phase hearing." *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002) (internal quotations omitted).

[4]The dissent characterizes this decision not to present psychological evidence as strategic because it would "make it easier for the judge to sen-

would use mitigating evidence as an aggravating factor, in violation of the mandatory language of Ariz. Rev. Stat. § 13-703(E). When asked in a pre-hearing interview about his decision not to introduce evidence of Correll's psychological disorders, counsel responded:

> [A]s a practical matter, and certainly with Judge Howe [the trial judge], once he found out that this man was a sociopath or psychopath, whichever term you want to use, he didn't have a chance in a hundred of keeping from getting the death penalty. 'Cause even though he can claim that this is a mitigating factor the reality is that when you tell someone in society and certainly Judge Howe, the man is a sociopath, that dictates that he's the kind of person who should get the death penalty, that's what the thinking's going to be.

This entire line of reasoning, however, presumes that the judge would not follow the law[5]—speculation that is never appropriate and that is not supported by the record here.

---

tence Correll to death because it would cause him to view Correll as permanently psychologically damaged." However, counsel's failure to *investigate* Correll's psychological history for fear of the trial judge cannot be termed "strategic." Counsel worried that the trial judge would presume that any psychological evaluation portrayed Correll in a negative light if he granted a contact visit order for such an evaluation and the results were never submitted to the court. This fear presumes that the trial judge would act inappropriately by considering evidence outside of the record in making his sentencing decision, and it fails to recognize the importance of creating a record for review, even if the trial judge likely would be unsympathetic. Psychological injury is the type of evidence the Supreme Court has viewed as classic mitigating evidence. *Wiggins*, 539 U.S. at 534.

[5]*See State v. Vickers*, 129 Ariz. 506, 515, 633 P.2d 315, 324 (1981) (holding that personality disorders, while they do not qualify as statutory mitigators, must be considered as potential mitigators, particularly where there is evidence that the personality disorder influenced the defendant's behavior).

Fear of a particular sentencing judge's reaction also ignores the fact that, in capital cases, the Arizona Supreme Court conducts an independent review of the aggravating and mitigating factors, re-weighing them afresh. *See State v. Johnson*, 710 P.2d 1050, 1055 (Ariz. 1985) ("Whenever the trial court imposes the death sentence we must conduct an independent review of the facts that established the aggravating and mitigating circumstances in order to determine for ourselves if the latter outweigh the former and justify the sentence."); *see also State v. Richmond*, 560 P.2d 41, 51 (Ariz. 1976) ("[T]he gravity of the death penalty requires that we painstakingly examine the record to determine whether it has been erroneously imposed."). At the time of Correll's appeal, the Arizona Supreme Court was also required to conduct an independent proportionality review. *State v. Correll*, 715 P.2d at 737-38. Therefore, even if defense counsel's fears about the judge were legitimate, there is no strategic excuse for failing to put on evidence in support of statutory mitigating factors that the Arizona Supreme Court could have considered in its independent re-weighing of aggravating and mitigating factors.

**[14]** In short, to the extent that defense counsel had a strategy at all, it cannot be considered an objectively reasonable strategy.

3

Counsel's ineffective assistance at sentencing cannot be excused as strategic. He failed to conduct an investigation sufficient to make an informed judgment. To the extent that his decisions reflected any tactical considerations, his approach of not putting on a mitigation case cannot be considered an objectively reasonable strategy, even when viewed under the highly deferential *Strickland* standard.

### III

**[15]** It is, of course, not enough for Correll to establish that his counsel's performance at sentencing fell below an objective standard of reasonableness. He must also "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to "undermine confidence in the outcome." *Id.*

In considering this question, we have recognized that deficient performance and prejudice questions may be closely related. *See Summerlin,* 427 F.3d at 643 ("[W]e conclude that the failure of trial counsel to investigate, develop, and present mitigating evidence at the penalty phase hearing has undermined our confidence in the sentence of death imposed by the trial judge."); *Smith*, 189 F.3d at 1011 ("Because of [counsel's] failure to provide competent representation, our confidence in the outcome of Smith's sentencing has been undermined."). In establishing prejudice under *Strickland*, it is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances. *Williams*, 529 U.S. at 398. Accordingly, even where the facts discovered on habeas review do not rise to the level of statutory mitigation, we have held that a reasonable probability existed that this information could have affected the sentence. *Smith*, 140 F.3d at 1270; *see also Rompilla*, 125 S. Ct. at 2469 (noting that "although we suppose that [the sentencer] could have heard it all and still have decided on the death penalty, that is not the test").

Here, there was a substantial amount of classic mitigating evidence that could have been presented, but was not.

Correll had endured an abusive childhood. His mother was a Jehovah's Witness, whose commitment to her church came

before her commitment to her family. She spent most of her time with the church, often neglecting her six children's basic needs. The children were required to attend adult bible study class with her three nights a week, for three hours per night. If they misbehaved or indicated that they were confused or did not understand the religious doctrine, they were punished. Correll's father was largely absent but sometimes aided his wife in physically punishing their children. There was evidence of incest in the family.

When Correl was seven, a brick wall collapsed on his head. Although he was unconscious for some time after the accident, his parents did not seek medical treatment until several days later when he was still not back to normal. Several experts testified that this type of accident and the symptoms Correll exhibited then and now indicate a high likelihood of brain impairment.[6]

Against this backdrop, Correll began experimenting with alcohol and drugs around age ten. He was using marijuana, LSD, and amphetamines regularly by age twelve, behavior that can be characterized as self-medication for the everyday

---

[6]The district court dismissed evidence of Correll's brain injury, concluding that any organic brain injury played no role in Correll's crimes. The district court's conclusion was based on the judge's own evaluation of two conflicting experts. But in the procedural context of this case, the district court's role was not to evaluate the evidence in order to reach a conclusive opinion as to Correll's brain injury (or lack thereof). The district court should have decided only whether there existed a "reasonable probability" that "an objective fact-finder" in a state sentencing hearing would have concluded, based on the evidence presented, that Correll had a brain injury that impaired his judgment at the time of the crimes. *Summerlin*, 427 F.3d at 643. Because the competing neuropsychologists who testified at the evidentiary hearing agreed that the evidence of brain injury was at least strong enough to deserve presentation at a sentencing hearing, we conclude that Correll's evidence had at least a "reasonable probability" of persuading an objective fact-finder. The district court clearly erred when it concluded that Correll presented insufficient evidence of organic brain damage.

trauma of his life and for the mental health illnesses that were later diagnosed when he became a ward of the state.

It is notable that each of the six Correll children reported that they had or have had substance abuse problems beginning in childhood or adolescence. Further, at least five of the six children spent time in juvenile correctional facilities, and all four of the boys in the family have spent time in adult correctional facilities.

In response to Correll's obvious substance abuse problems, his parents intervened with beatings and threats of kicking him out of the house. Further, the state failed to recommend drug or alcohol treatment despite Correll's frequent contact with the juvenile authorities.

After Correll was shot in the arm at age 14, the hospital asked his parents to let him come home. They allowed him to recuperate at home for three or four days before asking the state to sever their parental rights. At that time, they cut off all communication with their son and considered him dead, as required by their church's teachings.

Correll became a ward of the state at age 14 and spent his teenage years in various state institutions described as "gladiator schools," which were characterized as cruel and inhumane, even by those who worked there. He was placed in programs for low-performing students, which were referenced as "dummy shacks." Within months of becoming a ward of the state, 14-year-old Correll became addicted to heroin.

Correll was committed to psychiatric institutions at least twice during his teen years and was described at age 16 as "severely psychologically impaired." He was treated with a tranquilizer/anti-psychotic drug while institutionalized, and he attempted suicide on two occasions. However, there is no evidence that Correll continued to receive treatment after these stays.

Methamphetamine eventually became Correll's drug of choice, which he used whenever he could. Correll offered expert testimony during the evidentiary hearing of the effect of high methamphetamine use, including brain damage, blackouts, and methamphetamine-induced psychosis, all of which may be compounded by sleep deprivation.

At the time of the murders, Correll was injecting a quarter gram to a gram of methamphetamine in one shot, and he was injecting three to four shots a day. According to expert testimony at the evidentiary hearing, Correll was in the top 1% of methamphetamine users in terms of quantity. During the period of time in which the crimes were committed, Correll's typical pattern was to go seven to ten days without sleep, followed by one to two days of continuous sleep. He was observed injecting methamphetamine shortly before the crimes were committed. Expert testimony indicated that he was likely having impulse control problems, judgment impairment, and aggressiveness at the time of the crime and that he may have been experiencing drug-induced paranoia.[7]

In sum, there was a substantial amount of mitigating evidence available,[8] which, taken together, is sufficient to raise

---

[7]The district court discounted much of this evidence on the ground that it was based on Correll's self-reported drug habits, which the court concluded were not credible. The conclusion that Correll's reports were not credible, however, is clearly erroneous in light of the substantial corroborating evidence introduced at the evidentiary hearing. Two witnesses, Dawn Day and Reverend Curry, testified as to their own observations of Correll's drug habits, and their observations fully comported with Correll's self reports. Medical and prison records indicated that Correll had issued identical self reports at times when he had no incentive to exaggerate the extent of his drug abuse. Furthermore, Correll's reports of his drug use have never varied, over the course of several decades. In short, there was no reason for the district court to doubt the veracity of Correll's self reports. On the contrary, there was significant evidence tending to corroborate Correll's account, including several records showing consistency over time of Correll's story.

[8]The government argues that much of this evidence was already before the sentencing court in the pre-sentence report. While the bare facts of

a presumption of prejudice under the Supreme Court's standard in *Wiggins*, 539 U.S. at 534-38.

But we need not rest on presumption. All of the available evidence constituted classic mitigation evidence that certainly had the potential to persuade "an objective fact-finder" that Correll was, at the time of the crimes, incapable of appreciating the wrongfulness of his conduct. *Summerlin*, 427 F.3d at 643. To use the Supreme Court's words, "[h]ad [a] jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

**[16]** Indeed, in this case, the evidence of Correll's "excruciating" history could have provided an alternative — and much more sympathetic — context for the horrific observations and conclusions that were before the judge in the presentence report. While the presentence report characterized Correll as a "threat" and a "menace," the evidence of Correll's family history, personality disorder, and brain injury could have colored Correll as an organically diseased and injured person who, through no fault of his own, lacks the ability to comprehend the immorality of his conduct. Correll's full history also had the potential to convince an objective fact-finder that his criminal behavior has, throughout his life, been his means of gaining the negative and destructive attention that he was taught to seek from a very young age. As the Supreme Court has consistently instructed, these kinds of claims constitute classic mitigation, which a fact-finder must consider when deciding between life imprisonment and death.

---

Correll's troubled past were indeed presented to the court, without further investigation and presentation of contextual evidence and argument, such facts served only to demonize Correll rather than to mitigate the appropriateness of imposing the death penalty for his actions.

Perhaps more compellingly, the evidence of Correll's methamphetamine use on the night of the crimes, had it been fully presented, could have risen to the level of a statutory mitigator. Under Arizona law, gross intoxication at the time of the crime constitutes a statutory mitigator if that intoxication impaired the defendant's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." A.R.S. § 13-703(G)(1). There was undisputed evidence adduced at the evidentiary hearing that Correll was addicted to methamphetamine, that Correll used some methamphetamine on the day of the crime, that Correll habitually used methamphetamine in astonishingly and unusually high dosages, and that drug addicts generally are incapable of using their drug of choice in any dosage that is lower than their usual dosage. Thus, the evidence strongly indicated that Correll used an extremely high dosage of methamphetamine on the day of the crime.

The district court, however, concluded that there was no evidence of gross intoxication at the time of the crimes because certain witnesses indicated that Correll was oriented during the commission of the crimes. This conclusion rests on a critical misunderstanding of the evidence.

At the evidentiary hearing, expert testimony made it clear that gross methamphetamine intoxication, unlike gross alcohol intoxication, is not necessarily apparent to outside observers. The experts described a state known as "methamphetamine blackout," during which the user would be capable of performing complex tasks but would be incapable of understanding or remembering his behavior. One of the experts, a recovered methamphetamine addict, specifically confirmed the possibility that "those observing a person in a methamphetamine blackout [wouldn't] know that the person is in a methamphetamine blackout." This evidence severely undermines the propriety of the district court's reliance on witness observation in concluding that Correll was not intoxi-

cated on the night of the crimes. Those witnesses might not have known whether Correll was intoxicated or not.

Furthermore, the experts also testified that gross methamphetamine intoxication impairs a person's inhibition and judgment, rendering the intoxicated person incapable of measuring and understanding the consequences of his actions. A person in a methamphetamine blackout, the experts implied, would not be capable of understanding the "wrongfulness of his conduct."

**[17]** Thus, the district court was clearly wrong to conclude that there was no available evidence that Correll was grossly intoxicated — to the point of being unable "to appreciate the wrongfulness of his conduct" — on the night of the crime. Expert testimony at the evidentiary hearing clearly established that methamphetamine use, in the quantities that Correll undisputably used the drug on a regular basis, would significantly impair judgment and consciousness without causing perceptible symptoms of intoxication. We conclude that this evidence — had it been developed and presented — could reasonably be expected to persuade an objective fact-finder that Correll was incapable of understanding the wrongfulness of his conduct on the night of the murders.

The dissent argues that Correll was not prejudiced by the failure to investigate and present mitigation evidence and argument because the presentation of such evidence and argument "would have enabled the prosecution to present very damaging evidence in rebuttal." However, a significant portion of that damaging rebuttal evidence was already available through the pre-sentence report. For example, the "numerous escapes from mental health treatment facilities" and the "hostage taking and armed aggression against mental health workers" were both clearly delineated in the pre-sentence report.

Furthermore, *all* of the so-called "damaging rebuttal evidence" could, in the hands of a competent attorney, have been

used to support Correll's claims of dysfunctional upbringing and continuing mental disorder. For example, Correll's statement that he felt "a strong sense of power and excitement" when he committed armed robbery could show either that Correll is dangerous — as the presentence report concluded — or that Correll has a diseased perception of social interaction, which prevents him from conforming his conduct to the law. Indeed, all of the facts on which the dissent relies could be either dehumanizing or mitigating, depending on the context and history given for each cited fact.[9]

In view of the record developed at the evidentiary hearing, we conclude that there is a reasonable probability that the outcome of Correll's sentencing would have been different had he received competent representation. This was an unusual case in the capital context because it involved a defendant who had not killed any of the victims, although he certainly attempted to kill one person who fortunately survived. The actual murders were committed by another person. The failure to present a mitigation case was particularly indefensible under Arizona law that existed at the time, which required the imposition of the death penalty absent a case in mitigation. Given all of these factors, there is a significant possibility that the introduction of *some* mitigating evidence could have spared Correll's life.

IV

[18] Correll was constitutionally entitled to the presentation of a mitigation defense. He did not receive one, although substantial mitigation evidence existed. Most importantly, because Arizona law required the imposition of a death sentence if aggravating factors were proven and no mitigating

---

[9]That some of the defense witnesses at sentencing might have presented inculpatory testimony is not particularly significant, given that counsel had abandoned at sentencing any claims of actual innocence or misidentification.

factors presented, the failure to present any mitigation defense constituted ineffective assistance of counsel under the standards set forth in *Strickland*. The fear of a trial judge cannot be considered strategic justification for forgoing the presentation of a mitigation defense, particularly given that (1) Arizona law required imposition of the death penalty when no mitigating factors were found, and (2) the Arizona Supreme Court was required to re-weigh the aggravating and mitigating factors. Furthermore, the evidence adduced at the evidentiary hearing revealed several classic mitigators that a reasonable attorney could have used to contextualize Correll's violent past and to mitigate Correll's current culpability.

**[19]** We conclude the Correll is entitled to relief in the form of a new penalty phase trial. We reverse the judgment of the district court and remand with instructions to issue a writ of habeas corpus.

**REVERSED.**

---

O'SCANNLAIN, Circuit Judge, dissenting:

I respectfully dissent from the court's conclusion that Correll has met the "highly demanding and heavy burden of establishing actual prejudice" in the pursuit of his claim of ineffective assistance of counsel during the penalty phase of the trial. *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 394 (2000)) (internal quotation marks omitted). The majority ignores the mountain of precedent which requires us, in assessing prejudice, to consider not only the likely benefits of the mitigating evidence Correll's counsel failed to present, but also its likely drawbacks. In addition, the majority substitutes its independent analysis of the record for that of the district court, relying on its own view of the evidence rather than considering, as we must, the effect the evidence would have had on an Arizona

sentencing judge 23 years ago. Because I do not believe that Correll has met his burden "affirmatively [to] prove prejudice," I would affirm the judgment of the district court denying the petition for writ of habeas corpus. *See Strickland v. Washington*, 466 U.S. 668, 693 (1984).

I

The facts of Correll's brutal crimes are disturbing, but must be recounted to illustrate the unlikelihood that Correll's new evidence would have convinced the sentencing judge not to impose the death penalty.[1]

A

On the night of April 11, 1984, as Guy Snelling and his girlfriend Debra Rosen were getting ready to go to sleep, a knock came at the door. Snelling answered the door and found John Nabors, his co-worker, and Correll, whom he had not met.

After Snelling let the two men into his home, Nabors pulled a gun and demanded money. Correll secured Snelling and Rosen with duct tape. When Robin Cady and Shawn D'Britro, two friends of Snelling, unwittingly arrived at the house, Correll secured them with duct tape as well. Then Correll and Nabors escorted Snelling throughout his home to search for money and valuables.

After raiding the house for approximately 45 minutes, Nabors and Correll exited with Cady, D'Brito, and Snelling, whom they forced into Cady's car. Nabors briefly went back inside to secure Rosen. While holding the gun on the three

---

[1]Although it is normally not necessary to restate the facts and procedural history in a dissenting opinion, the reader will understand that this exercise is necessary due to the sharp divergence between the majority's presentation of the facts and the district court's factual findings.

victims, Correll drove to a deserted area where Nabors's truck was parked. Nabors took his truck and followed Correll, who was still driving Cady's car with the three victims, to a desert area north of Phoenix. There, they forced the three victims out of the car and made them lie face down on the ground. Correll shot Snelling in the back of the head. Nabors then shot and killed D'Britro, and then tried to shoot Cady. The gun misfired a couple of times and Correll said "hurry up, hurry up, . . . okay, it's cool, no cars coming, get a shell chambered." After reloading the gun, Nabors was finally successful in shooting and killing Cady. After Correll and Nabors left, Snelling, who miraculously did not die, reported the crime. Rosen, whom Nabors and Correll had left in the house when they drove the other three victims into the desert, was later found in the house, killed by strangulation.

B

At trial, Correll's sole defense was misidentification—namely, that Snelling, who was under the influence of drugs and alcohol when the crimes occurred, had wrongly identified Correll as one of his assailants, and that it was reasonably likely that Correll's brother Terry, who resembled Correll, had committed the crimes instead. Unpersuaded by this defense, a jury convicted Correll of three counts of first degree murder, one count of attempted first degree murder, one count of armed robbery, one count of first degree burglary, and four counts of kidnaping.

At sentencing, the government urged the court to impose the death penalty. The government asserted that five statutory aggravating factors were present: (1) a previous violent felony conviction;[2] (2) grave risk of death to others in addition to the persons murdered;[3] (3) commission of the murders in antici-

---

[2] Ariz. Rev. Stat. § 13-703(F)(2).

[3] *Id.* § 13-703(F)(3).

pation of pecuniary gain;[4] (4) commission of the murders in an especially heinous, cruel or depraved manner;[5] and (5) convictions for multiple murders during the offense.[6]

In response, Correll's attorney argued that the prosecution had failed to prove, as required by *Enmund v. Florida*, 458 U.S. 782 (1982), that Correll intended to kill Rosen, Cady, and D'Brito. Although the sentencing court did not accept this argument, Correll's attorney preserved it for appeal and the Arizona Supreme Court later modified one of Correll's death sentences to life imprisonment on this ground. *See State v. Correll*, 715 P.2d 721, 730-31 (Ariz. 1986). Correll's attorney also countered each of the government's proffered aggravating factors.[7] He argued—and the sentencing court agreed—that the "grave risk of death to others" aggravating factor did not apply. He also argued that the multiple murder aggravating factor could not be considered. Although the sentencing court did not accept this argument, Correll's attorney preserved it for appeal and the Arizona Supreme Court later invalidated this aggravating factor. *See id.* at 734-35. Correll's attorney further argued, unsuccessfully, that the evidence did not support the remaining aggravating factors.

---

[4]*Id.* § 13-703(F)(5).

[5]*Id.* § 13-703(F)(6).

[6]*Id.* § 13-703(F)(8).

[7]The majority unduly discounts defense counsel's attack of the government's asserted aggravating factors. *See* Maj. Op. at 5450-51. Both the Arizona Supreme Court and the state trial court disagreed with the majority's assessment of counsel's performance with respect to the "grave risk of death to others" and the "multiple murders" aggravating factors, agreeing with counsel's assertion that the first factor was unsupported and the second was unconstitutional in this case. The Arizona Supreme Court also found persuasive defense counsel's argument that the government failed to prove beyond a reasonable doubt that Correll intended to kill one victim and therefore the death penalty could not be imposed on that count. Furthermore, counsel made compelling substantive legal and factual arguments with respect to the other aggravating factors.

   In addition to challenging the government's aggravating factors, Correll's attorney also presented substantial mitigating evidence.[8] First, counsel emphasized that it was John Nabors, not Correll, who actually shot the three victims who died. Second, counsel endeavored to present Nabors as the "leader" and "planner" of the criminal endeavor, accentuating the facts that "Mr. Nabors was the one that knew Guy Snelling was a drug dealer," and that "Snelling would have money and drugs [when] the robbery occurred. In addition, counsel drew the court's attention to Snelling's statement that "it appeared to him that John Nabors was the leader, was the one calling the shots, so to speak." Finally, counsel pointed out that, prior to the robbery, it was impossible for Correll reasonably to have anticipated that anyone would be present in the home other than Snelling, and that, consequently, Correll could not have planned the three deaths.[9]

   Third, Correll's attorney also argued for mitigation, both in his sentencing memorandum and at oral argument, on the grounds that Correll was under the influence of drugs and alcohol at the time of the murders.[10] Counsel specifically drew the sentencing judge's attention to Snelling's statement to the police that he smelled alcohol on Correll's breath during the crimes.

---

   [8]The majority quotes the state trial court record, which reads that "Defendant waive[d] presentation of mitigating evidence." Maj. Op. at 5447. This excerpt, however, was merely the conclusion of the court clerk. In the district court proceedings, defense counsel adamantly maintained that "[w]e didn't waive" the presentation of mitigating evidence.

   [9]At the time of sentencing, Arizona state law explicitly provided that such inability reasonably to foresee that one's conduct would cause death to another person was a statutory mitigating factor. Ariz. Rev. Stat. § 13-703(G)(4).

   [10]A defendant's inability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law is a statutory mitigating factor. *See* Ariz. Rev. Stat. § 13-703(G)(1).

Fourth, counsel presented Correll's troubled family history, explaining that "the reason that Mike [Correll] has had problems is the fact that when he was 14 years old, that both of his parents abandoned him and what can be expected when someone is abandoned by their parents at such an early age?" Finally, Correll's attorney also argued that Correll's age—24 —was mitigating.[11]

Although Correll's attorney knew that Correll had received psychological counseling, he declined to develop psychological evidence because he believed, based on his conversations with Correll, that the only possible diagnosis was antisocial personality disorder. As counsel explained at the evidentiary hearing, he believed such a diagnosis would carry little, if any, mitigating weight with the sentencing judge and would, in fact, make it easier for the judge to sentence Correll to death because it would cause him to view Correll as permanently psychologically damaged.[12]

## C

The sentencing judge ultimately found four statutory aggravating circumstances.[13] Determining that the mitigating evi-

---

[11]A defendant's age is a statutory mitigating factor. *See* Ariz. Rev. Stat. § 13-703(G)(5).

[12]As the district court summarized the evidence presented at the sentencing hearing:

Rather than argue Petitioner's personality disorder to Judge Howe, [counsel] decided that Petitioner had a better chance to avoid the death penalty if he portrayed that Petitioner was involved in a drug ripoff which had gone terribly wrong, that Petitioner had only been a follower in the matter, that he had not been the trigger-man as to the three people who died, that Guy Snelling had reported to police that Petitioner was under the influence of drugs and/or alcohol at the time of the crimes, and that he should be shown sympathy because his family abandoned him at the age of 14.

[13]The Supreme Court has since held that Arizona's practice of judges finding aggravating factors violates the Sixth Amendment right to a jury.

dence did not outweigh these factors, the judge sentenced Correll to death on each of the murder counts. The Arizona Supreme Court affirmed Correll's convictions, with the modifications previously mentioned. It then re-weighed the aggravating and mitigating factors and determined that the death penalty was appropriate. *Correll*, 715 P.2d at 736.

In his state petition for postconviction relief, Correll alleged that his counsel rendered ineffective assistance at sentencing. He contended that during the month that elapsed between the jury verdict and the sentencing hearing, his attorney met with him for just five minutes. He also contended that his attorney failed to investigate and to develop available evidence relating to his psychiatric history and condition at the time of the crimes. The state trial court summarily dismissed Correll's petition, concluding that Correll raised "no colorable issues" relating to ineffective assistance of counsel. The court went on to explain that "the Court specifically recalls that the trial work of defense counsel was precise, careful, and competent, and manifested strategic and tactical judgments of the same high quality." The Arizona Supreme Court denied review without comment.

Correll later filed a federal petition for writ of habeas corpus and the district court entered summary judgment against him. On appeal ("*Correll I*"), we held that Correll's ineffective assistance allegations, which had not been fully explored in state court, entitled him to an evidentiary hearing. We held that Correll had established (1) that the state court trier of fact had not conducted a full and fair hearing to find the relevant facts, and (2) that his allegations, if proven, might constitute a colorable ineffective assistance claim. *Correll v. Stewart*, 137 F.3d 1404, 1411-12 (9th Cir. 1998).

---

*See Ring v. Arizona*, 536 U.S. 584 (2002). *Ring* does not apply, however, to cases such as this one that were already final on direct review. *See Schriro v. Summerlin,* 542 U.S. 348, 358 (2004).

## D

Pursuant to our instructions on remand, the district court conducted an evidentiary hearing on Correll's ineffective assistance of counsel claim. The evidentiary hearing lasted nine days. The district court heard testimony from 17 witnesses, 14 called by Correll (who waived his appearance), and three called by the government. In addition, the district court reviewed reams of documents, including Correll's attorney's notes, which were nearly a quarter-century old, and Correll's childhood medical records, which were two decades older.

After outlining all the evidence in a detailed 109-page disposition, the district court made several findings. First, as to the sufficiency of counsel's consultation with Correll, the court rejected Correll's allegation that counsel spent only five minutes with him between conviction and sentence. Instead, the district court found that "[p]rior to sentencing, [counsel] had multiple face-to-face meetings and phone calls with Petitioner" in which he "discuss[ed] with Petitioner the overall mitigation case and the specific reasons he would present to the court in favor of a life sentence rather than the death penalty."

Second, as to the sufficiency of counsel's investigation of possible mitigating evidence, the district court found that counsel spoke to between 40 and 50 witnesses, including every member of Correll's family who would cooperate. The district court further found that, unfortunately, "[t]he witnesses were not able to provide relevant useful mitigation information." In fact, "in many instances, the witnesses only provided inculpatory and non-mitigating information."

The district court did find that counsel's performance was constitutionally deficient in two respects: (1) counsel's failure to obtain medical treatment records relating to the head injury Correll suffered at seven years old and (2) counsel's failure to thoroughly review Correll's mental health records. The court

determined that a reasonable attorney would have investigated these matters for possible mitigating evidence rather than relying on his own impression, based on his interaction with the defendant, that the defendant had no intellectual or psychological deficits that could serve as mitigating evidence.

Nevertheless, the district court found that Correll was not prejudiced by these errors. After Correll's postconviction counsel developed all the evidence relating to Correll's head injury and mental health history, the district court still found Correll to be a "highly functioning adult" who never suffered from brain damage or a major psychological disorder. Thus, the district court found that Correll's medical and mental health records provided no substantial evidence of mitigation. Furthermore, the district court found that much of the new evidence Correll offered would have been counterproductive if put before the sentencing judge because it would have "opened the door for the prosecution to come forward with strong damaging rebuttal information to counter its mitigating effect."

## II

In reversing the district court's judgment, the majority concludes that the district court committed "clear error" in finding that counsel's investigation and presentation of possible mitigating defenses was constitutionally sufficient. Under the clearly erroneous standard of review, our scrutiny of a district court's factual findings must be "significantly deferential, in that we must accept the district court's factual findings absent a definite and firm conviction that a mistake has been committed." *Hovey v. Ayers*, 458 F.3d 892, 900 (9th Cir. 2006) (quoting *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002)) (internal quotation marks omitted).[14] In other words, as

---

[14]Because Correll's petition for a writ of habeas corpus was filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, pre-AEDPA law governs our review. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997).

long as the district court's account of the evidence " 'is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.' " *Phoenix Engineering and Supply Inc. v. Universal Elec. Co., Inc.*, 104 F.3d 1137, 1141 (9th Cir. 1997) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985)).

Unfortunately, the majority ignores these instructions and embarks on its own independent examination of the facts presented to the district court. By contrast, as indicated by its exhaustive 109-page disposition, the district court's findings were well-supported by the facts and reached only after a thorough review of all available evidence. I simply cannot agree that the district court's findings were erroneous at all, let alone clearly erroneous.

More alarming than its reconstruction of the record, however, the majority jumps with startling speed from its new factual determination that Correll received ineffective assistance of counsel to its ultimate conclusion that his habeas petition must be granted. In so doing, the majority ignores *Strickland*'s second requirement, that even if Correll proves ineffective assistance of counsel, he must also prove that the result was actually prejudicial. *Wiggins*, 539 U.S. at 534 (citing *Strickland*, 466 U.S. at 692). As the Supreme Court has made clear, we do not presume prejudice from counsel's ineffective assistance. *Strickland*, 466 U.S. at 693. Rather, even if counsel's performance was deficient, Correll still bears the "*highly demanding and heavy burden* of establishing actual prejudice." *Allen*, 395 F.3d at 1000 (internal quotation marks omitted) (emphasis added). This burden "affirmatively [to] prove prejudice" requires Correll to show more than the mere possibility that counsel's performance prejudiced the outcome. *Strickland*, 466 U.S. at 693. Instead, Correll must demonstrate "a reasonable probability" that, but for counsel's constitution-

ally deficient performance, he would have received a lesser sentence. *Id.* at 695.

In assessing prejudice in this case, it is important to remember that "we are not asked to imagine what the effect of certain testimony would have been upon us personally," *Stewart v. Smith*, 140 F.3d 1263, 1270 (9th Cir. 1998), or even to imagine the effect of such testimony on an abstract juror. Instead, we must determine what the effect of Correll's new evidence would have been upon the Arizona sentencing judge at the time of Correll's sentencing hearing 23 years ago. *Id.* As discussed below, none of the evidence unearthed during the district court's evidentiary hearing creates a "reasonable probability" that Correll would have received a lesser sentence had it been presented at the sentencing phase of his trial. Accordingly, I cannot conclude that Correll has met the heavy burden required to establish prejudice.

## A

First, Correll's attorney's failure to obtain the medical records relating to Correll's childhood head injury was not prejudicial because these records did not, in fact, demonstrate any brain damage. After receiving testimony from neuropsychologists, the district court found that Correll "did not suffer any brain injury from the block wall that fell on him when he was 7 years old." Quite to the contrary, the district court credited a neuropsychologist's testimony that "of all the capital defendants he has tested, Petitioner is one of the highest functioning."

The medical records from the incident support this assessment. After his childhood injury, Correll was diagnosed with a subgaleal hematoma, which is a bruise or collection of blood under the scalp, but above the skull. The hematoma cleared in five days, at which time a doctor described the seven-year-old Correll as alert and well. I accordingly cannot agree with the majority's conclusion that Correll has carried

his burden to establish a reasonable probability that he would have received a lesser sentence if the records relating to his childhood head injury had been before the sentencing judge. Indeed, as we have suggested before, counsel's failure to present "mitigating evidence may be irrelevant when no substantial mitigating evidence is available." *Smith v. Stewart*, 189 F.3d 1004, 1013 n.4 (9th Cir. 1999) (citing *Gerlaugh v. Stewart*, 129 F.3d 1027, 1042 (9th Cir. 1997)). The medical records, which led the district court to conclude that Correll was a "highly functioning adult," presented no opportunity for mitigation.

## B

In assessing the remainder of Correll's mitigating evidence, it is important to emphasize that the majority's conclusion that Correll has met the heavy burden of demonstrating actual prejudice ignores a mountain of precedent which requires us to consider not only the benefits of the ostensibly mitigating evidence counsel failed to present, but also its potential drawbacks. In *Darden v. Wainwright*, 477 U.S. 168, 186 (1986), trial counsel's failure to present any mitigating evidence did not constitute deficient performance because the presentation of such evidence would have opened the door to damaging rebuttal evidence. Similarly, in *Burger v. Kemp*, 483 U.S. 776 (1987), trial counsel's failure to present psychological records did not amount to ineffective assistance because the records were "by no means uniformly helpful to petitioner," as they suggested "violent tendencies" that would have undermined counsel's strategy of portraying petitioner's actions as the result of another person's "strong influence upon his will." *Id.* at 793. Based on these cases, we have held that an attorney who failed to present psychological testimony relating to the defendant's antisocial personality disorder was not ineffective because such testimony "would have allowed the prosecution during cross-examination and rebuttal to rehash the horrific details of [the] crimes." *Bonin v. Calderon*, 59 F.3d 815, 836 (9th Cir. 1995). Most recently, the Supreme Court, in *Wiggins*

*v. Smith*, 539 U.S. 510 (2003), repeatedly emphasized that the *Darden-Burger* line of cases remains in effect. In *Wiggins*, the Court held that the petitioner had met his heavy burden of proving actual prejudice because "Wiggins d[id] not have a record of violent conduct" that the State could have introduced to offset the mitigating evidence his attorney failed to offer. *Id.* at 537. The majority fails to realize that unlike Wiggins, much of the new mitigating evidence Correll offers would have enabled the prosecution to present very damaging evidence in rebuttal. Indeed, Correll's mitigating evidence presents precisely the type of "double edge" the Supreme Court found lacking in Wiggins's case. *Id.* at 535 (distinguishing the mitigating evidence presented by Wiggins from the double-edged evidence presented in *Burger*, 483 U.S. 776, and *Darden*, 477 U.S. 168).

1

I begin with Correll's new psychiatric evidence, which would not have significantly helped his case. The district court found that "there is insufficient evidence to support that Petitioner has ever suffered from any major mental illness, whether PTSD [post traumatic stress disorder], a major depressive disorder, or a bipolar disorder." The district court reached this factual finding after two psychological experts testified that there was no evidence Correll has ever suffered from these disorders. The sole witness who speculated that Correll might have suffered from post traumatic stress disorder acknowledged that such a diagnosis was "only a possibility." The district court found Correll's self-reporting of bipolar disorder and severe depression incredible in light of Correll's obvious motive to fabricate and in light of the fact that these diagnoses do not appear in his records and Correll indicated that he was never given medication to treat them.

The district court also found that the evidence did not support Correll's contention that he was given anti-psychotic medications while in custody. In reaching this factual finding,

the district court noted that the mental health experts for both parties scrutinized Correll's medical records from the California Department of Corrections ("CDC") and reported the absence of any indication that anti-psychotic medication was ever prescribed. Although it appears that Correll was given Mellaril for a period of time as a juvenile, the government's mental health expert, Dr. John Scialli, M.D., testified without opposition that the dosage—25 milligrams—would have served as a mild tranquilizer and was far lower than the dosage that would be utilized to counteract psychosis (approximately 625 milligrams).

Accordingly, had Correll's attorney thoroughly reviewed Correll's mental health records, he would have only had credible evidence for the diagnosis he already suspected: antisocial personality disorder accompanied by mild depression. As we have repeatedly acknowledged, a diagnosis of antisocial personality disorder may be "potentially more harmful to [a] petitioner than [helpful]." *Gerlaugh*, 129 F.3d at 1035. We have explained that, because of its "obvious countervailing tactical dangers," such evidence "[i]n its best possible light, it is a basket of cobras." *Id.* Accordingly, in a prior case, "we c[ould] identify no prejudice flowing from counsel's failure to develop" psychiatric testimony relating to a defendant's antisocial personality disorder. *Id.*; *see also Darden*, 477 U.S. at 186-87 (counsel's decision not to present mitigating character or mental-state evidence was sound trial strategy because it would have opened the door to damaging rebuttal evidence, including a psychiatric opinion that the defendant had a sociopathic personality); *Daniels v. Woodford*, 428 F.3d 1181, 1204, 1210 (9th Cir. 2005) (indicating that testimony suggesting that a capital defendant is a "sociopath" is aggravating rather than mitigating); *Beardslee v. Woodford*, 358 F.3d 560, 583 (9th Cir. 2004) (acknowledging that an antisocial personality diagnosis can be damaging to a capital defendant); *Caro v. Woodford*, 280 F.3d 1247, 1257 (9th Cir. 2002) (concluding that a psychologist's testimony did not help the defendant's mitigation case because it tended "to paint him as a violent

psychopath"); *Clabourne v. Lewis*, 64 F.3d 1373, 1384 (9th Cir. 1995) (noting that mental health records omitted from the sentencing hearing "hardly turned out to be helpful" because they indicated that the defendant had "an antisocial personality"); *Williams v. Calderon*, 52 F.3d 1465, 1472 (9th Cir. 1995) ("We have no doubt that . . . statements [suggesting that the defendant is sociopathic] did nothing to advance Williams's cause.").

Furthermore, had counsel presented Correll's mental health records at sentencing, he would have opened the door for the prosecution to present extremely damaging rebuttal evidence that would have likely eviscerated the minimal mitigating impact these records carried. The district court "credit[ed] counsel's] testimony that the prosecutor, Sidney Davis, had a reputation for excellent preparation and that she would have left no stone unturned in her opportunity to rebut any mitigation evidence presented." Accordingly, the district court found that, had Correll's attorney presented mental health evidence, this "highly skilled" prosecutor would have presented a great deal of aggravating evidence that was not already before the sentencing judge, specifically: (1) Correll's rape of a female psychotic patient while being treated for his antisocial personality disorder and mild depression; (2) Correll's numerous escapes from mental health treatment facilities and numerous rejections of institutional efforts to provide him with mental health treatment; (3) an incident where Correll took hostages in an armed attempt to escape from a mental health treatment facility; (4) the underlying factual basis of Correll's prior convictions for armed robbery; (5) the conclusion of a social evaluation at age 18 that Correll was a danger to the community and was not a candidate for probation; (6) additional information showing the efforts of Correll's parents to deal with his drug abuse problem and to obtain psychological treatment for him following his armed threat against a teacher at school; (7) Correll's statement that he had no desire to work but only wished to enjoy himself; and (8) Correll's

statement that when he committed the 1978 armed robberies that it gave him a strong sense of power and excitement.

Finally, presentation of Correll's antisocial personality disorder at sentencing would have severely undermined counsel's strategy of arguing that Correll was merely following Nabors's lead during the commission of the crimes. Had counsel introduced evidence of Correll's antisocial personality disorder diagnosis, the prosecution would have almost certainly responded by pointing out that Correll, at age 18, instigated the armed robbery of three convenience stores at gunpoint, an effort in which he enlisted the assistance of his 13-year-old brother and 15-year old girlfriend. We have previously held that counsel's failure to present psychological evidence is not prejudicial where it would have distracted the fact-finder from counsel's main mitigation theory and other mitigation evidence. *See Bonin*, 59 F.3d at 836 (finding that counsel's failure to present expert psychological testimony was not prejudicial because it "would have distracted jurors . . ., reduced [the defendant's] credibility with the jury, and opened the door to powerful cross-examination and rebuttal"); *see also Burger*, 483 U.S. at 793 (holding that a petitioner failed to prove ineffective assistance where the affidavits detailing the defendant's behavioral history his attorney failed to present "are by no means uniformly helpful to petitioner because they suggest violent tendencies that are at odds with the defense's strategy of portraying petitioner's actions on the night of the murder as the result of [another person's] strong influence upon his will").

In sum, the psychological evidence, if presented, would have demonstrated only that Correll has an antisocial personality with mild depression. Such evidence has tremendous potential to be more harmful than helpful. Further, such evidence would have opened the door for the prosecution to introduce a laundry list of extremely damaging information not already before the sentencing judge and would have crippled Correll's chances of convincing the sentencing judge that

he was merely following Nabors's lead during the crimes.[15] Accordingly, contrary to the majority's conclusion, Correll cannot prove a reasonable probability that he would have received a lesser sentence if the available psychological evidence had been before the sentencing judge.

2

Given the lack of substantial mitigation found in Correll's medical and psychiatric records, Correll cannot claim to have been prejudiced by counsel's failure to offer further evidence of Correll's drug use beyond what he already presented to the sentencing judge. The district court found that there was no evidence—other than Correll's self-serving statements—that Correll was significantly impaired *at the time of the crimes*. Arizona law at the time provided that "[a] defendant's intoxication or alcoholism at the time of the offense is a mitigating circumstance *if* the evidence shows that it significantly impaired the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." *State v. Zaragoza*, 659 P.2d 22, 30 (Ariz. 1983) (emphasis added). The district court specifically found that Correll's behavior during the murders indicated he was not intoxicated:

> [I]t was Petitioner who remained calm when the gun

---

[15]While the majority concludes that "a significant portion of that damaging rebuttal evidence was already available through the pre-sentence report," Maj. Op. at 5464, it fails to acknowledge what Correll's counsel realized, that the introduction of some potentially mitigating evidence would open the door to a parade of horribles. For example, while the pre-sentence report summarily discloses Correll's conviction of three counts of armed robbery in 1978, Correll's attorney understandably wanted to preclude damning rebuttal evidence revealing that Correll enlisted his 13-year-old younger brother and his 15-year-old girlfriend in these crimes. Furthermore, the pre-sentence report is silent regarding other extremely damaging information that the prosecutor would have surely brought to light in rebutting certain potentially mitigating evidence.

misfired as Nabors was trying to kill Robin Cady. It was Petitioner who encouraged Nabors to remain calm as there were no cars coming, to get a shell chambered and shoot Cady. Such behavior at the time of the crime does not demonstrate intoxication and, in fact, undercuts an assertion of intoxication.

*See Williams v. Woodford*, 384 F.3d 567, 624 (9th Cir. 2004) (reasoning that there is little basis for believing that drugs materially affected the defendant's behavior at the time of the crimes when the facts of the crimes reflect deliberate and methodical action).

Furthermore, no witnesses could have established that Correll was intoxicated on the date of the crimes. The best evidence Correll can point to would have come from his sister, who could have testified that Correll used methamphetamine in the morning on the day *before* the crimes. Correll was not prejudiced by counsel's decision not to present his sister's testimony, however, because cross-examination would have eviscerated any remaining residual doubt in the sentencing judge's mind as to Correll's guilt. Correll maintained his innocence throughout the sentencing proceedings. However, Correll's sister knew he was with Nabors at the time of the crimes and that they had sought a ride out of the state very soon after the murders occurred. Accordingly, as the district court found, her testimony would have "totally eliminated any mitigating weight" and residual doubt from Correll's assertion at the guilt phase of his trial that it was his brother, not he, who had committed the murders. *See Allen*, 395 F.3d at 1004 (explaining that "mitigation witnesses proffered by [the defendant] would not have proved helpful given their own involvement in [the defendant]'s criminal enterprise."); *Williams v. Woodford*, 384 F.3d 567, 624 (9th Cir. 2004) ("[T]he best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking. The best thing he can do, all else being equal, is to raise doubt about his guilt.").

The only other witness Correll's postconviction counsel presented relating to drug use was Dawn Day, who testified that she used methamphetamine with Correll during a four month period from November 1982 until February 1983. We cannot consider Day's testimony, however, because Correll failed to establish that Day was available to testify at his sentencing hearing. *See Douglas v. Woodford*, 316 F.3d 1079, at 1086 n. 2 (9th Cir. 2003) (explaining that testimony presented at a district court evidentiary hearing that was not available to counsel at the sentencing hearing may not be considered for prejudice purposes). Furthermore, even if Correll had established that Day would have been available, Day's testimony that Correll used methamphetamine more than one year before the crime would have provided little support for Correll's argument that, *at the time of the crime*, he was so impaired that he was unable "to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." *Zaragoza*, 659 P.2d at 30.[16]

The majority attempts to minimize counsel's complete inability to present any corroborating evidence that Correll either used methamphetamine on the date of the crimes or appeared intoxicated to anyone he encountered that day by instead pointing to expert testimony that "gross methamphetamine intoxication, unlike gross alcohol intoxication, is not necessarily apparent to outside observers." Maj. Op. at 5463. Consequently, the majority appears content to rely exclusively on Correll's self-serving statement that he was intoxicated at the time of the crimes to reach the conclusion that counsel's failure to present further evidence of his drug use was prejudicial. I, on the other hand, would prefer to rely on the credibility findings made by the district court. Those findings bear repeating in full:

---

[16]Indeed, there was evidence in the record that suggested that Correll was *not* intoxicated at the time of the crimes. Specifically, when Correll and Nabors entered Snelling's trailer home, the first thing they asked Snelling was "whether he had any speed."

The Court does not credit [Correll's] unsubstantiated self-report that he abused methamphetamine every day before the crimes were committed. Petitioner chose not to testify at the evidentiary hearing; Petitioner chose not to fully cooperate with [the government's drug abuse expert's] examination of him regarding the issue of drug abuse. Because of the obvious motive to fabricate, Petitioner's self-serving statements about his drug usage prior to the crimes is [sic] unreliable and subject to searching skepticism. *See, e.g.,* [*State v.*] *Medrano*, 914 P.2d [192,] 227 [(Ariz. 1996) ("the defendant provided most of the information concerning his use of cocaine in the past and on the night of the murder, as well as the drug's effect on him. Because of the obvious motive to fabricate, such self-serving testimony is subject to skepticism and may be deemed insufficient to establish mitigation.")]; *see also Bernard Smith* [*v. Stewart*], 140 F.3d [1263,] 1270 [1998] (evaluating evidence based on impartial sentencing judge applying Arizona law); *see generally, Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decision maker is reasonably, conscientiously, and impartially applying the standards that govern the decision."). The Court's searching skepticism toward Petitioner's self report is corroborated by Respondent's drug abuse expert, Dr. Matthews, who opined as follows: "Antisocial personality disorder is characterized by malingering and deceit; instances of [Petitioner's] lifelong pattern of deceptiveness abound throughout his penal and other records. He has been deceitful about a great many matters, including his history of substance abuse. Because of [Petitioner's] history of deceit, it is a major clinical error to accept [Petitioner's] self-serving view of his condition at the time of the offense as accurate.

Because there was no other evidence to establish that Correll was intoxicated at the time of the crimes, I cannot agree with the majority that Correll was prejudiced by counsel's failure to present expert testimony regarding the effects of methamphetamine addiction at the sentencing hearing. Conversely, I agree with the district court that counsel's decision reflects a reasonable strategic choice. First, the district court found that "any expert would have to take into account the underlying facts of the crimes, which show that [Correll] was involved in deliberative acts, such as planning, conspiring, avoiding detection, . . . awareness of wrongdoing," and the fact that he was "generally orientated [as] to time, place, and reality." This would have materially undermined counsel's strategy of portraying Correll as merely following Nabor's lead. Second, the district court acknowledged that any expert "would have been forced to utilize hypothetical supposition regarding [Correll's] conduct at the time of the crimes," and that "[s]uch hypothetical supposition would have opened the door for contrary rebuttal argument and reiteration by the prosecution regarding the lack of factual support and incredulity of [Correll's] alleged intoxicated condition at the time of the crimes."

Yet it is solely on the strength of such "hypothetical supposition" that the majority now declares that the district court was "clearly wrong" to conclude that there was no evidence to support Correll's assertion that, on the night of the crimes, he was "grossly intoxicated—to the point of being unable to appreciate the wrongfulness of his conduct," as required for mitigation. Maj. Op. at 5464. The majority points to the testimony of two drug abuse experts presented by Correll's post-conviction counsel at the evidentiary hearing. The district court, however, reasonably declined to credit these experts' opinions because they were not based on an examination of Correll but instead were based on a hypothetical set of facts provided by Correll's postconviction counsel. As the district court explained:

> Dr. Sullivan did not examine Petitioner nor did he look at Petitioner's Arizona Department of Corrections or CDOC records. Rather, Dr. Sullivan was asked to assume [a set of] hypothetical facts [that] do not accurately or reliably portray Petitioner's alleged drug abuse. . . . [H]is opinion was based on unsubstantiated and unreliable assumptions.

In addition, Correll's other expert witness on drug addiction, Dr. Shaw, whom the majority quotes for the proposition that Correll "may have been experiencing drug-induced paranoia" at the time of the murders, Maj. Op. at 5461, was "thoroughly impeached" at the evidentiary hearing. As the district court explained, "Dr. Shaw admitted that he only minimally considered the facts of the crime before reaching his conclusion." The district court found Dr. Shaw's opinion "entirely not credible and wholly speculative" because, like Dr. Sullivan's opinion, it was "based upon hypothetical drug usage at the time of the crimes that was not established."

In stark contract to the hypothetical assumptions on which Drs. Sullivan and Shaw based their opinions, the district court found that, except for 229 days, Correll was incarcerated throughout the nine-year period between October 1975 (when he was first incarcerated, at age 14) and March 1984 (one month before the murders) and that Correll "was not a methamphetamine addict or a long-term abuser of methamphetamine during the time he was incarcerated."

Consequently, I agree with the district court that counsel's failure to present further evidence of Correll's drug use was not prejudicial. Counsel had already stated that Correll had been using alcohol and drugs and presented Snelling's statement that he smelled alcohol on his captor's breath. I agree with the district court that if Correll's attorney had called an expert to testify, "it is highly likely any lay witness basis for the expert's opinion could have been cross-examined at sentencing and impeached by virtue of the fact that no lay wit-

ness could testify that Petitioner was intoxicated at the time of the crimes." I also credit the district court's observation that "if an expert had testified based solely on Petitioner's self-reporting . . . it is very likely that the expert's opinion would have been severely undermined by undisputed evidence that Petitioner had spent almost 9 of the last 10 years incarcerated with little or no access to drugs."

Nevertheless, the majority's independent review of the expert testimony leads it to conclude that the evidence "*clearly established* that methamphetamine use, in the quantities that Correll *indisputably* used the drug on a regular basis, would significantly impair judgment and consciousness without causing perceptible symptoms of intoxication." Maj. Op. at 5464 (emphasis added). I do not quarrel with the notion that severe use of methamphetamine may significantly impair judgment and consciousness. Whether the symptoms of methamphetamine intoxication are perceptible or not, however, it is quite disputable that Correll used the drug "on a regular basis" and it is entirely unproven that Correll used the drug on the date of the crime.

Accordingly, I share the district court's inability to find that Correll was prejudiced by counsel's decision not to present additional evidence of drug use beyond what he already had.[17]

---

[17]I would further note that a drug defense likely would have evoked less sympathy from an Arizona sentencing judge 22 years ago than it does from the court today. *See Mayfield v. Woodford*, 270 F.3d 915, 931 (9th Cir. 2001) (crediting testimony that there were "no death penalty cases tried in San Bernardino County prior to 1983 where a drug defense had been successful in gaining either an acquittal or in reducing the sentence from death to life without parole."). The sentencing judge very likely would have taken note of the fact that Correll never sought treatment for his substance abuse problem and repeatedly secured his removal from the mental health programs in which he was placed either by escaping or by violently assaulting the staff.

3

Finally, Corell has presented no credible evidence about his childhood that his attorney could have placed before the sentencing judge other than the evidence the sentencing judge already had before him. The district court, who is in the best position to determine credibility, found Correll's uncorroborated allegation that his mother banged his head against a kitchen table incredible. In regard to the head injury Correll suffered at age seven when a cinder block wall fell on him, the district court expressly found that Correll's parents were not negligent in securing medical care. After reviewing the medical records presented at the evidentiary hearing, the district court found that Correll's parents took him to the family doctor the same day the accident occurred and "acted reasonably in caring for Petitioner, which included two visits to their family doctor, one emergency room visit and a follow-up visit for additional specialized testing."

The majority cites evidence of Correll's family history provided by Reverend Curry, whom the district court found "was not an available witness" for counsel at the time of the sentencing hearing. The district court found "that if [Reverend Curry] had been contacted by [counsel] prior to sentencing, he would have informed him that he would not discuss information about Petitioner or appear at sentencing because it was against California law for him to discuss former residents of the CYA."[18] Accordingly, Reverend Curry's testimony cannot

---

[18]While the majority quotes Reverend Curry's testimony that he "would have unhesitatingly come to help" Correll, *see* Maj. Op. at 5446 n.2, I credit the district court's finding that at the time of the sentencing hearing he was unavailable to help. Reverend Curry testified that he "cannot offer testimony or assertions regarding people who have been in California Youth Authority [because] [i]t is forbidden by law." Reverend Curry testified that while others could contact him, he "could not make contact with" counsel and when he "talked with [his] supervisors about it, . . . they said no." Furthermore, defense counsel testified that when he contacted Reverend Curry's wife, she informed him that the Reverend "didn't really want to be involved."

factor into the prejudice analysis. *See Douglas*, 316 F.3d at 1086 (explaining that testimony presented at a district court evidentiary hearing that was not available to counsel at the sentencing hearing may not be considered for prejudice purposes).

The majority suggests that counsel should have presented evidence of Correll's parents' religious fanaticism as Jehovah's Witnesses, specifically their decision, "[a]fter Correll was shot in the arm at age 14," to "cut off all communication with their son and consider[ ] him dead, as required by their church's teachings." Maj. Op. at 5460. Of course, the majority's analysis ignores the district court's finding that, by age 14, Correll had "already been arrested several times," that his parents had responded by providing him with "extensive psychological treatment," and that only after "another arrest" did his parents allow him to become a ward of the state.

Similarly, the majority suggests that counsel should have presented evidence that Correll's parents used corporal punishment "in response to his obvious substance abuse problems." Maj. Op. at 5460. Once again, the majority ignores the district court's finding that, had counsel emphasized such evidence, the prosecution would have countered with evidence that Correll's parents took him to a private psychologist and participated in a six-month treatment program with him after Correll was expelled from the eighth grade for threatening a teacher with a knife.

Finally, the majority indicates that evidence of incest in the family could have served as mitigating evidence. Maj. Op. at 5459. At the evidentiary hearing, Correll's sister Patty testified that their father had been arrested and convicted of child molestation. Correll's sister Robin testified that she suffered "repeated and continual" sexual molestation at the hands of her father and her brothers, specifically Correll himself. Because the prosecution almost certainly would have presented such evidence in rebuttal, Correll cannot claim that he

was prejudiced by counsel's failure to present evidence of incest as a mitigating fact.

Accordingly, on balance, presentation of family history evidence would have been counterproductive. I cannot agree with the majority's conclusion that Correll has met his burden to prove that, had counsel presented more detailed evidence about his childhood, he would have received a lesser sentence.

## III

The sum of the majority's analysis in this case simply eviscerates the requirement that a habeas petitioner demonstrate actual prejudice in order to prevail on a claim for ineffective assistance of counsel. *See Wiggins*, 539 U.S. 510. Not satisfied with merely reconstructing the facts, the majority also reinvents Supreme Court authority, asserting that Correll presented evidence sufficient to establish a presumption of prejudice under *Wiggins*, and that this "classic mitigation evidence . . . certainly had the potential to persuade at least one factfinder that Correll was, at the time of the crimes, incapable of appreciating the wrongfulness of his conduct." Maj. Op. at 5462. These statements, of course, are patently absurd, as even a cursory review of the facts in *Wiggins* reveals that Correll fell drastically short of carrying the demanding burden of proving actual prejudice the Supreme Court found sufficient in that case.

In holding that Wiggins had met his burden to prove actual prejudice, the Supreme Court explained that Wiggins "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother," that he suffered "physical torment, sexual molestation, and repeated rape" during his subsequent years in foster care, and that he spent time homeless. *Id.* at 512. Perhaps most critically, Wiggins was mentally retarded. *Id.*

In stark contrast, Correll's history, which reveals that he was "a highly functioning adult" at the time of his crimes, comes nowhere close to the "powerful mitigating narrative" present in *Wiggins*. *Id.* at 513. Furthermore, the Supreme Court noted that Wiggins lacked a "record of violent conduct," *id.* at 537, and found no evidence "suggest[ing] that a mitigation case, in its own right, would have been counterproductive." *Id.* at 525. Correll's history, on the other hand, littered with numerous examples of his violent and destructive lifestyle, stands at the very opposite end of the spectrum. Indeed, the district judge, who was in the best position to evaluate all the evidence, concluded that, after considering both the positive and negative repercussions of Correll's new evidence, the balance of aggravation and mitigation had "barely been altered."

Viewed against the standard set forth by *Strickland* and rearticulated in *Wiggins*, the majority's conclusion that the insubstantial mitigating evidence Correll now offers was sufficient to meet the "highly demanding and heavy burden of establishing actual prejudice" not only misapplies the test these cases impose, it essentially writes the prejudice requirement out of our circuit jurisprudence altogether.

Accordingly, I must respectfully dissent.